Appeal of JAMES P. McKENNA.            Docket No. 121.

Taxpayer's occupation was that of race-track bookmaking. He operated his handbook on a modification of the parimutuel system. *Held:* The gross income derived from such bookmaking operations is determined by applying against the total receipts therefrom, the sum of the amounts paid to bettors on his handbook plus amounts returned to bettors by reason of scratches, called-off bets, and "lay-off" bets.

Submitted November 17, 1924; decided January 13, 1925.

*Hugh Satterlee, Esq.*, for the taxpayer.

*Willis D. Nance, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

*Robert Spear, Esq.*, filed a brief as *amicus curiae*.

Before IVINS, KORNER, and MARQUETTE.

This appeal involves an individual income tax for the calendar years 1919 and 1920 arising under the Revenue Act of 1918.

### FINDINGS OF FACT.

1. During the years 1919 and 1920 the taxpayer, James P. McKenna, was engaged in race-track "bookmaking" in the State of Kentucky. In the year 1920 this constituted his sole occupation, while for a portion of the year 1919 bookmaking did not constitute his sole occupation.

2. Under the laws of Kentucky gaming contracts are declared void and any money or property lost in such gaming contracts may be, under certain specific limitations, recovered by the loser, his creditor, his heirs, or by any other person. Betting on horse races is such a gaming contract.

3. The taxpayer operated his handbook on a modification of the pari mutuel system with the limitation that he would in no event pay more than 15 to 1 on any horse. The taxpayer agreed to pay the bettor whatever the pari mutuel machine showed to be the price of a horse, not to exceed 15 to 1. Under this system the taxpayer's handbook was devised as nearly as possible to yield a percentage of profit on the whole book regardless of win, place, or show of the entries.

4. The taxpayer received bets deposited by his customers and acted as stakeholder of the bets thus posted on his handbook. In case of a scratch, or in case bets were called off, he returned the deposit to the bettor. In some cases deposits for bets were posted with him in excess of his ability to cover in his own handbook. In such cases he handled these deposits for bets through "lay-off" bets; that is, by placing such excess deposits for bets with other bookmakers. Such operations were ultimately cleared through this taxpayer by the latter receiving from other bookmakers the winnings due to his customers and paying to such customers the amount of such winnings. In such cases the taxpayer did not share in the winnings

resulting from such "lay-off" bets. He acted merely as the representative or agent of both parties in such operations.

5. The taxpayer maintained a bank account in which were deposited the moneys received by him in the operation of his handbook as well as receipts of money in the year 1919 from other sources. It was customary for taxpayer to pay his handbook customers by personal check although in several instances he withdrew money from the bank by counter checks for this purpose. The gross receipts of money by taxpayer were deposited in this bank account.

6. The taxpayer made return of his income on the cash receipts and disbursements basis and reported for the year 1919 a taxable income of $8,819.71 and paid a tax thereon in the amount of $460.17; for the year 1920 he reported a taxable income of $7,336.69 and paid a tax thereon in the amount of $271.67. The amounts so returned as taxable income were arrived at by the taxpayer in the following manner: He treated his bookmaking operations *en bloc* and applied against his *year's receipts* from handbook operations the payments made by him to winning bettors on his handbook, plus amounts returned to bettors in cases in which bets were called off, in cases of scratches, and in cases of "lay-off" bets. The resulting figure was treated by the taxpayer as his *gross income* from *bookmaking* operations.

7. On audit the Commissioner disallowed the method of determining taxable income employed by the taxpayer and restored to income all those amounts paid by taxpayer to winning bettors or his handbook, as well as amounts returned by taxpayer to bettors in cases in which bets were called off, in cases of scratches and "lay-off" bets. This action by the Commissioner resulted in a determination of net income for 1919 of $17,624.11 and in 1920 of $35,556.82. Thereupon the Commissioner determined a deficiency in tax for 1919 of $1,121.45 and for 1920 of $4,859.97. On July 11, 1924, the Commissioner notified the taxpayer by registered letter of his determination and on September 5, 1924, the taxpayer initiated this appeal by filing a petition with this Board.

8. At the hearing of this appeal the taxpayer admitted, and it is so found, that his net taxable income for the year 1919 should be increased by $4,776.55, which amount represents income from sources *other than handbbook operations*. It is further found as a fact that the amounts paid by the taxpayer to winning bettors on his handbook operations plus amounts returned to bettors in cases in which bets were called off, in cases of scratches and in cases of "lay-off" bets, aggregate for the year 1919, $3,611.05 and for the year 1920, $22,874.40. It is further found that the taxpayer's *gross receipts* from all sources within those years (including bookmaking operations) were, respectively, $40,382.60 and $38,433.99, while his statutory deductions for the same years were, respectively, $22,758.49 and $2,877.17.

DECISION.

The deficiency should be computed in accordance with the following opinion. Final decision of the Board will be settled on consent or on seven days' notice in accordance with Rule 50.

OPINION.

KORNER: The question presented by this appeal is whether the winnings realized from gaming operations are taxable as income and if so, what portion of said winnings constitutes taxable income.

The facts giving rise to this appeal are fully stated in the findings of fact and need not be restated except in a brief and summary manner. The taxpayer was in the years 1919 and 1920 a bookmaker and operated in the State of Kentucky. His entire receipts for the year 1920 grew out of such operations. In 1919 he received $4,776.55, which did not arise out of his handbook operations and which, it is agreed by both parties, constitutes net taxable income for that year. Since this item of $4,776.55 does not enter into the controversy here, it need not be further referred to except to say that the determination by the Commissioner to the extent that it is predicated on that item of income for 1919 is approved.

The taxpayer contends that his winnings on handbook operations should not be taxed because, (1) they do not constitute income within the purview of the Sixteenth Amendment to the Constitution or within the terms of the Revenue Act of 1918; (2) under the laws of the State of Kentucky such winnings are gifts and not income, and (3) even if construed to be income they are not such until after the statutory period of limitations has tolled the loser's right to recover his losses. All of these contentions are based on the statute law of Kentucky making gaming contracts void and providing a right of recovery on the part of the loser of his losses, through institution of suit therefor, within certain statutory limitations as to time. Upon this premise the taxpayer concludes that any obligation arising out of a wager is void except the statutory right of the loser to recover his money lost. He argues further that since the winner has received property in which he has no legal right of ownership, he is a donee in the event of the loser's failure to dispossess him of such winnings, and being a donee, gifts to him are not income under the Sixteenth Amendment or the Revenue Act of 1918.

It is one of the axioms of the law that a wrongdoer will not be heard to urge his own wrong doing, or the illegality of his own acquisition, in bar of rights of third parties, and this is equally true when such third party is the Federal Government seeking the right to assert a tax predicated upon ownership of property so acquired. Although the ownership of the taxpayer might under given conditions be ousted, until the happening of that event the present owner should not be heard to plead that the failure on the part of another, having a legal right to oust his ownership, to exercise that right constitutes the present owner a donee. We think he should not be allowed so to do.

But there are other equally cogent considerations impelling to this conclusion. The nature of the right on the loser's part to enforce restitution should be examined. This right is to bring an action to recover losses sustained in a gaming contract. He can recover in no other way. The law lays no obligation on the loser to bring such action. Until he does so the parties to the gaming contract remain *in statu quo*, and transfers made under such contracts are

binding on the parties, and titles thereunder are indefeasible. It is an elementary principle of law that courts will refuse to assist either party to an illegal contract—either to enforce or to abrogate it. In such cases the courts allow the parties to abide by the results of their own actions. Only to this extent is the term *void* applicable to such contracts, because in such a situation the contract is as efficacious as a legal and valid contract could be in so far as the parties themselves are concerned. How, then, is such a situation changed by the law of Kentucky allowing the loser to sue to recover his losses? In order to discourage transfers under such contracts, the Kentucky statute provides that the courts shall, if called upon, take jurisdiction and enforce restitution. Until the loser moves thereunder the parties are just where they would be if no such statute existed. Without that statute no enforceable status of debtor and creditor would exist. The statute, then, does not provide for the enforcement of a preexisting status, but provides a new right in the loser. When the ownership is transferred by the gaming contract, no obligation to return the property is contemplated either by the contract or by law. True, the loser may, under the statute, sue and recover his losses, but his right to do so is purely statutory and is not predicated on a relationship of debtor and creditor. If, then, the loser does not pursue his remedy under the statute, there is no obligation to return property won by wager and unless and until the loser does so act the property is unqualifiedly that of the winner; the rights and property pass to the winner in possession and he takes them as purchaser and not as donee. A failure on the part of the loser to exercise a statutory right to such restitution can not change the character of the original transfer from a purchase to a gift. Again, since as we have shown there is no obligation on the winner to return the property unless and until forced by judgment to do so, his liability under the statute is contingent upon the loser exercising his right. Until he is so divested of the property, it is that of the winner from the time he wins it under the gaming contract.

The next question for consideration is whether such winnings are " gains, profits, and income " within the meaning of the Revenue Act of 1918. That act provides in part as follows:

SEC. 213. That for the purpose of this title * * * the term " gross income "—

(a) Includes gains, profits, and income derived * * * from any source whatever.

It is contended by the taxpayer that winnings on gaming contracts do not constitute gains, profits, and income within the meaning of the revenue act just quoted, because such contracts are illegal and have no recognition at law, and that the language of the act has application to gains, profits, and income from legal transactions and sources only. We do not think this contention well founded. In the first place the words " from any source whatever " are as broad and comprehensive as it is possible for language to be. There is no limitation that the gains, profits, and income must be legally received. To read the above quoted section of the statute as if it were " from any *legal* source whatever " would be to read into the statute something which Congress did not see fit to incorporate therein. To do so would be to legislate rather than to interpret, and this

we have no authority to do. In our opinion Congress meant precisely what it said when it included gains, profits, and income from any source whatever, irrespective of the nature of that source. The ·English case of *Partridge* v. *Mallandaine*, decided by the High Court of Justice (Queen's Bench Division), 2 Great Britain Tax Cases, 179, is in point. The statute under consideration there provided for the taxing of income arising from any profession or vocation. To that extent it was even narrower than the revenue act here being considered. By act of Parliament betting was illegal. The court was considering whether income received by certain bookmakers was taxable under the income tax act. The court held that the income of the bookmakers was taxable and that to construe the act as contended by the bookmakers would be to discriminate in favor of persons with whom the legislature was not disposed to deal with favor, and against a taxpayer who received his income from honest sources. The court then said:

These persons go to races and they systematically bet, and for this reason, it must be assumed, make profits. Does it lie in their mouths to say that they are not to be assessed to income tax because they can not bring an action in respect of the bets which they make? Every year they have so many of their bets paid as puts, say, £1,000 a year in their pockets; and to say that because they can not bring an action to recover the bets they make, betting being made illegal by act of Parliament, therefore they do not carry on a vocation, it seems to me is putting a construction upon the act which would be giving a very undue favour to persons with whom the legislature is by no means disposed to deal with favour, inasmuch as the thing they do is a thing which is hampered by the legislature because it is supposed to be mischievous, namely, the recovery of bets by actions so as to facilitate the making of bets and the carrying on of vocations such as this. But I go the whole length of saying that, in my opinion, if a man were to make a *systematic business* of receiving stolen goods, and to do nothing else, and he thereby systematically carried on a business and made a profit of £2,000 a year, the income tax commissioners would be quite right in assessing him if it were in fact his vocation. There is no limit as to its being a lawful vocation, nor do I think that the fact that it is unlawful can be set up in favor of these persons as against the rights of the revenue to have payment in respect of the profits that are made.

Again, gambling is not an offense *malum in se* but is merely *malum prohibitum* in certain State jurisdictions. It is not even *malum prohibitum* under Federal law. The statute we are construing here is a Federal statute. The income tax law is strictly a revenue measure enacted for the purpose of raising the necessary revenues for the Federal Government. Congress says " gains, profits, and income derived from any source whatever," and we are of opinion that Congress meant just what it says, and that the wagers won by this taxpayer come within the terms of section 213 (a) of the Revenue Act of 1918.

We now come to the question of what portion of the taxpayer's receipts from his handbook operations constitute taxable net income. But before *net* income can be determined it is necessary to clearly define *gross* income because *net* income is *gross* income minus certain prescribed statutory deductions. Net income *is* gross income only in the event there are no such deductions. In the instant appeal there are no statutory deductions to be considered, as will appear hereinafter, and so, for the purposes of this case, *gross* income may be taken as *net* income. What, then, is the gross income here?

The Supreme Court in *Eisner* v. *Macomber*, 252 U. S. 189, 207–208, said:

After examining dictionaries in common use (Bouv. L. D.; Standard Dict.; Webster's Internat. Dict.; Century Dict.), we find little to add to the succinct definition adopted in two cases arising under the corporation tax act of 1909 (*Stratton's Independence* v. *Howbert*, 231 U. S. 399, 415, 34 Sup. Ct. 136, 140. 58 L. Ed. 285; *Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179, 185, 38 Sup. Ct. 467, 469, 62 L. Ed. 1054), "income may be defined as the gain derived from capital, from labor, or from both combined," provided it be understood to include profit gained through a sale or conversion of capital assets, to which it was applied in the *Doyle Case*, 247 U. S. 183, 185, 38 Sup. Ct. 467, 469 (62 L. Ed. 1054).

Brief as it is, it indicates the characteristic and distinguishing attribute of income essential for a correct solution of the present controversy. The government, although basing its argument upon the definition as quoted, placed chief emphasis upon the word "gain," which was extended to include a variety of meanings; while the significance of the next three words was either overlooked or misconceived. "*Derived—from—capital*"; "the *gain—derived—from capital*," etc. Here we have the essential matter: *not* a gain *accruing* to capital, not a *growth* or *increment* of value *in* the investment; but a gain, a profit, something of unexchangeable value, *proceeding from* the property, *severed from* the capital, however invested or employed, and *coming in*, being *derived*"— that is, *received* or *drawn by* the recipient (the taxpayer) for his *separate* use, benefit, and disposal—*that* is income derived from property. Nothing else answers the description.

The same fundamental conception is clearly set forth in the sixteenth amendment—"incomes, *from* whatever *source derived*"—the essential thought being expressed with a conciseness and lucidity entirely in harmony with the form and style of the Constitution.

The decision in *Merchants Loan & Trust Co.* v. *Smietanka*, 255 U. S. 509, 519, 520, is to the same effect.

In the case of *Ludington* v. *McCaughn*, 190 Fed. 604, the District Court for the Eastern District of Pennsylvania was considering the question of what constitutes *actual income*. The court referred to section 202(a)(1) and (2) of the Revenue Act of 1918, and then said (p. 605):

This provision, standing alone, gives color to the plaintiff's contention, but not when considered in relation to the sixteenth amendment and in relation to other provisions of the act. The grant of power extended only to the taxation of *actual income*. The act intended to tax only *actual income*, which means actual gross income less the deductions specified in the act. Included in gross income are "gains, profits, and income derived from * * * sales or dealings in property, whether real or personal." And among the deductions allowed are "losses sustained during the calendar year, and not compensated for by insurance or otherwise, if incurred in any transaction entered into for profit, though not connected with the trade or business." The adoption of the sixteenth amendment was proclaimed by the Secretary of State on February 25, 1913, and, in order that gains and losses that had accrued prior to that time should be excluded in the computation of "income," the market price as of March 1, 1913, was selected as the basis for computing gains and losses as to property acquired prior thereto. In other words, the act was to operate only on gains and losses accruing subsequent to the adoption of the amendment. But, in selecting this method of accomplishing the result, Congress did not intend to impose a tax on a mere fictitious or paper profit, or to permit the deduction of a mere fictitious or paper loss. Only *actual gains* are taxed; only actual losses are deductable. The intent and purpose of section 202 is this: That where a part, but not all of an actual gain accrues after March 1, 1913, only so much as accrues after that date is income, and where a part, but not all, of an actual loss accrues after March 1, 1913, only so much as accrues after that date is deductible. It is a limitation upon the amount of gains that are taxed and of losses that are deductible. Given an actual gain or loss, the market value on March 1, 1913, was selected as a reasonable criterion for determining how much, if any, of the gain or loss accrued subsequent to the adoption of the amendment. (Italics ours).

The court then discusses *Walsh* v. *Brewster*, 255 U. S. 536, and cites that case as illustrative of the principle that actual gain is the criterion in determining income and that only such actual gain is taxable. The court concludes the discussion of *Walsh* v. *Brewster* (*supra*) in these words:

The decision was that a tax assessed on the difference between that amount and the selling price was illegal, *no actual gain having been realized.* (Italics ours).

An interesting and pointed discussion of the principle involved here is found in *United States* v. *Central National Bank*, 10 Fed. 612. That case was decided by the District Court of the Southern District of New York, in 1882, under the revenue act passed June 30, 1864, which was a statute levying an income tax. The court in considering the question of what constitutes "profits," as going to make up income, said, at page 614:

It cannot be supposed that the term "profits," in section 121, just quoted, means *gross receipts* on the profit side of its ledger without deductions for expenses in carrying on the business, and losses of whatever nature to which it is exposed in the legitimate prosecution of its business. (Italics ours.)

From the foregoing authorities it is clear that the gains, profits, and income which constitute gross income are *actual* gains, profits, and income. From such, the law authorizes certain statutory deductions in fixing *net income*—the precise income upon which the tax assessment is laid. But, as stated above, we are concerned here only with *gross income*, which means actual gains, profits and income derived from any source whatever. (*Doyle* v. *Mitchell Bros. Co.*, 247 U. S. 179.)

The question before us resolves itself to this: What was the actual gain resulting to the taxpayer from his handbook operations? In the pari mutuel system of wagering on horse racing the odds are fixed after the race is won. All the money bet forms a pool out of which payments of a fixed percentage are made to the State and to the licensed commission under whose auspices the races are run, the residue being apportioned to the bettors. Thus the track odds determined. The taxpayer operated his handbook on this principle. He agreed with each bettor to pay him the track odds as determined by the pari mutuel machine. The only reservation made by him was that he would not pay more than 15 to 1. That is to say, he agreed to pay the track odds provided such odds were not determined to be greater than 15 to 1. If the track odds were greater than that, he agreed to pay only 15 to 1. Since he accepted bets on any horse the bettor selected, it is apparent that the taxpayer must of necessity lose on certain books. In theory his handbook was made up of wagers against each horse in the race, at odds which would result in a net winning to him no matter which horse won. But, obviously, since only one of the horses against which the wagers were laid can possibly win, the bookmaker must necessarily win and lose as a result thereof. As stated above, theoretically and in a properly balanced handbook, the bookmaker wins as the net result of the race and the gain derived from the book is not the total sum won, but that sum less the total sum lost. But every book may not be properly balanced and one may show a total loss while another may show a total gain. The result is that the taxpayer's actual gain or

loss on his handbook must abide the result of his entire operation. To view it otherwise would be to make handbook operations a series of individual and segregated operations analogous to each turn of a roulette wheel, each throw of the dice, or each hand in a poker game. The fallacy of determining *actual* gain by such process is illustrated as follows: A man plays poker 5 nights each week for 50 weeks, 250 nights in all, during a taxable year. That is his sole occupation. During every one of such nights he wins $5,000 but loses $5,500. The game is on a strictly "cash" basis and he finds each night that he is actually out of pocket $500—that is, he has $500 less each night than when he entered the game. At the end of the year he is actually poorer by $125,000 than when he began. Yet during the year he has won pots aggregating $1,250,000. We are unable to concede that in such a case he has an *actual gain* of $1,250,000.

Again the illustration may be put this way: The same player under the same conditions loses each night $5,000 but likewise wins each night $5,500. At the end of the year he has won pots aggregating $1,375,000, but has on hand exactly $125,000 as a result of his play. That is all he has *actually gained*. We can not see that he has actually gained $1,375,000.

But, as we view it, the taxpayer's is an even stronger case because his system of operations is predicated on a percentage of profit covering a long series of books. As we have observed, he does not bet to win on each book but trusts to his skill in so arranging the series that a percentage of gain may result. We conclude therefore that the actual gain or profit derived from the taxpayer's operations in laying wagers on horse racing under his system of handbooks— known as bookmaking—is the aggregate of his receipts less the amounts paid out to bettors. From this aggregate there should also be eliminated moneys returned by the taxpayer to bettors in cases of bets called off, on scratches and in "lay-off" bets. These latter amounts were never properly *receipts* by the taxpayer in the sense of contributing to gains, profits, and income. The formula just given will represent the actual gains to the taxpayer and as such constitute "gross income" within the meaning of section 213(a) of the Revenue Act of 1918.

In the instant case the amounts paid to bettors were less than the taxpayer's receipts on his handbook and we have the case of actual gain constituting gross income. We are not here considering the situation which would arise if the reverse were true and the final result of these operations showed an *actual loss*. Whether such actual losses would constitute "deductions" within the meaning of the statute in ascertaining net income we are not called upon to decide here and as to that question no opinion is expressed. In so far as taxpayer's handbook operations are concerned this appeal presents no question of statutory deductions, and our only concern here is to determine the gross income on such operations. Such *gross* income *is net* income here and is taxable as such.

There does appear, however, in this appeal certain statutory deductions for both years 1919 and 1920 which did not grow out of, and were in no way connected with, the taxpayer's handbook transactions. The amounts of these deductions are not in dispute and are

properly deductible from the gross income determined as we have above indicated.  These deductions are: (1) For 1919, $22,758.49; (2) for 1920, $2,877.17.

In making his examination the revenue agent identified certain items as payments to bettors on handbook transactions but which items were disallowed by the Commissioner as not applicable against gross receipts in arriving at taxpayer's income for taxation.  There is no evidence before us indicating that the items so identified by the revenue agent were not correctly identified and we have accepted those amounts as found by him as applicable against gross receipts in determining gross income.  These amounts are: (1) For 1919, $2,058; (2) for 1920, $16,262.

The taxpayer claimed further amounts in addition to those identified by the revenue agent as amounts either paid to bettors or returned to them by reason of scratches or calling off of bets, or passed on to others as "lay-off" bets.  The amounts so claimed by taxpayer were: (1) For 1919, $1,903.05; (2) for 1920, $8,852.40.  Taxpayer introduced oral and documentary evidence of his contention on this point.  We have found these amounts to be, for 1919, $1,553.05, and for 1920, $6,612.40.  The sum of these amounts and those identified by the revenue agent represent the amounts for the respective years 1919 and 1920, which should be applied against gross receipts to determine gross income.

We are of opinion the deficiency should be computed on net taxable income as follows:

|  | 1919. | 1920. |
|---|---|---|
| Gross receipts | $40,382.60 | $38,433.99 |
| Less payments out and refunds, etc., on handbook | 3,611.05 | 22,874.40 |
| Gross income | 36,771.55 | 15,559.59 |
| Statutory deductions (not connected with handbook) | 22,758.49 | 2,877.17 |
| Net taxable income | 14,013.06 | 12,682.42 |