Charles V. Doyle and Clara Doyle v. Commissioner.
Doyle v. Commissioner
Docket No. 43868.
United States Tax Court
T.C. Memo 1954-234; 1954 Tax Ct. Memo LEXIS 10; 13 T.C.M. (CCH) 1171; T.C.M. (RIA) 54340; December 27, 1954, Filed E. J. Blair, Esq., for the petitioners. Edward L. Newberger, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The respondent determined deficiencies in the income tax of the petitioners and additions to tax under sections 293(a), 294(d)(1)(A) and 294(a)(2) of the Internal Revenue Code of 1939 as follows: Additions to tax
Defici-
Sec.
Sec. 294
Sec. 294
Year
ency
293(a)
(d)(1)(A)
(d)(2)
1948
$5,892.54
$294.63
$611.61
$407.74
1949
4,861.82
243.09
493.02
328.67
1950
3,654.54
182.73
178.70
By an amended answer the respondent asks that the deficiencies be increased by the following amounts: Additions to tax
Defici-
Sec.
Sec. 294
Sec. 294
Year
ency
293(a)
(d)(1)(A)
(d)(2)
1948
$4,892.88
$244.64
$440.38
$293.57
1949
4,411.20
220.56
397.01
264.67
1950
3,706.68
185.33
222.41
*11 The issues presented by the pleadings are the correctness of respondent's action in determining that (1) the petitioners realized a larger gross profit in 1948, 1949 and 1950 from their bookmaking operations than they reported; (2) the petitioners were not entitled to deduct expenses for rent and wages paid in 1948, 1949 and 1950; and (3) petitioners were liable for additions to tax under sections 293(a), 294(d)(1)(A) and 294(d)(2) of the 1939 Code. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners are husband and wife and reside in Evanston, Illinois. They filed Federal income tax returns for the years 1948, 1949 and 1950 with the collector for the first district of Illinois. During the years 1948, 1949 and through November 30, 1950, Charles V. Doyle, hereinafter referred to as the petitioner, was engaged in the business of accepting wagers on horse races, commonly known as bookmaking, in the State of Illinois. Petitioner accepted bets from his customers and agreed to pay the bettor, if he won his bet, such odds as were shown by the pari-mutuel machines of the various race tracks located in different parts of the country, *12 with the limitation that in no event would he pay more than $30 for $1, in respect to "win," $12 for $1, in respect of "place," and $6 for $1 in respect of "show." For a bettor to win a "win" bet the horse wagered on must come in first; to win a "place" bet the horse wagered on must come in first or second; and to win a "show" bet the horse wagered on must come in first, second or third. The average bets made were in $1 and $2 amounts, usually played to win, sometimes to place, and occasionally to show. In case of a "scratch" the wager was returned to the bettor. A "scratch" occurs when a horse entered in a race is withdrawn and does not run. In some cases wagers would be handled by a "lay-off" operation with other bookmakers. Such operations ultimately were cleared through the petitioner by the latter receiving from other bookmakers the winnings due his customers and paying to such customers the amount of such winnings. In such cases, the petitioner would not share in any of the winnings resulting from such "lay-off" operations. The petitioner merely acted as the representative or agent of both parties. The bets placed by patrons of petitioner were recorded by ticket writers employed *13 by him on printed forms known as safety tickets, the originals being given to the bettors, and the carbon copies being retained by the petitioner. These safety tickets are printed in duplicate in books of 10 pages with 20 tickets to a page, each ticket bearing a printed number. On these safety tickets in the spaces provided for the purpose was written the information containing the number of the horse, the kind of the bet, such as to win, place or show, and the amount of the bet. A large sheet for each track was hung on the wall each day which showed the entries for the day, the jockeys and probable odds. Each horse was shown by name and number, and the number corresponded to the number written in on the safety ticket when a wager was made on a certain horse. The petitioner subscribed to a wire service which gave information over a loud speaker such as the time when the race commenced, the progress of the race until it ended, the result, and then the odds payable at the track to the winners of win, place and show bets on the basis of $2 bets. A winner was required to present the original ticket to collect his wager. When presented the original was checked against the carbon copy by *14 petitioner, and if the carbon copy showed it to be a winning ticket the notation of the amount payable was entered thereon and the bettor was paid according to the amount of the wager and the odds at the track at which the horse ran, subject to the limitations hereinabove mentioned. At the close of each day bets received and all winning wagers paid out or payable to bettors as marked on the carbon copies of the safety tickets were totaled. Cash in the amount of each winning wager not immediately paid out was placed in an envelope in each instance and recorded as "outs." If a winning ticket was not presented within a reasonable period of time petitioner returned the amount so set aside as payable to winners to "ins." The necessity for this action was extremely rare. The total of all bets received, that is, "ins," and the total of all winning wagers, that is, "outs," were entered on a printed form of daily sheet on which were also entered disbursements made during the day for expenses such as rent, wages, telephone, wire service, scratch sheets, and the like. These daily sheets were prepared in duplicate, the original being given to petitioner's accountant, Rex N. Staats, and the copy *15 being retained by petitioner. On some days the "outs" would exceed the "ins" and petitioner had a loss and on other days the "ins" exceeded the "outs" and he had a profit. Petitioner did not retain the original safety tickets presented by winning patrons for the years 1948 and 1949. In 1950 he retained some of the original safety tickets where the bet was $10 or more. However, he did retain the carbon copies of the safety tickets for each day of operation, and the daily sheets herein mentioned were made from these carbon copies. Each day he placed in a large envelope, bearing the date thereon, the carbon copies of the safety tickets written that day, and receipts for disbursements for expenses. This envelope also contained the wall sheets for the day and the scratch sheet which showed the entries for that day and the results of the previous day. The records thus prepared and preserved were given to Staats, and from these Staats prepared monthly summary sheets. The monthly summary sheets were recapitulated and served as the basis for the preparation of petitioner's income tax returns for the years involved herein. The returns were prepared on the cash receipts and disbursements basis. *16 The contents of these envelopes were examined by respondent's agents during the investigation of petitioner's returns. The following is a summarization of the "ins" and "outs," gross profit, and percentage of gross profit to "ins" prepared by Staats from records submitted to him by petitioner covering the calendar years 1948, 1949 and 1950: Gross
Per-
Year
Total Ins
Total Outs
Profit
centage
1948
$334,716.35
$309,156.50
$25,559.85
7.64%
1949
303,525.50
280,377.30
23,148.20
7.63%
1950
251,842.65
236,038.90
15,803.75
6.28%
During the years 1948, 1949 and through November 30, 1950, the petitioner rented a room in Chicago where he accepted wagers. He paid the following sums as rent for this room: 1948
$2,580
1949
2,580
1950
2,563
In the conduct of his business of bookmaking he paid total wages to five employees in 1948 and 1949 and four employees in 1950 as follows: 1948
$8,920
1949
8,580
1950
8,330
Petitioner made no payments to public officials or law enforcement officers in order to operate as a bookmaker. The respondent increased the petitioner's net income as disclosed by the returns *17 in the years 1948, 1949 and 1950 by the respective amounts of $21,300.44, $19,345.37 and $19,454.22 with the following explanation: "(a) Proper records have not been furnished to substantiate your net income for * * * [1948, 1949 and 1950] as required by section 54 of the Internal Revenue Code and the applicable regulations. The amount of outs reported in your return appears excessive and has not been substantiated. * * *" The amount of "outs" disallowed in each year when added to the gross profit reported raised the gross profit of petitioner to 14 per cent of the "ins" reported by him instead of the percentage as hereinabove set forth. The bookmaking business conducted by petitioner was illegal under the Criminal Code of the State of Illinois. The petitioner failed to file a declaration of estimated tax for the years 1948 and 1949. These failures were not due to reasonable cause but were due to wilful neglect. Petitioner's declaration of tax for 1950 was $620. Opinion Section 54[1] of the 1939 Code provides that a taxpayer shall keep such records as the Commissioner deems necessary to determine whether such person is liable for an income tax. Respondent *18 contends that petitioner's records were inadequate because he did not retain the original safety tickets returned by winning bettors, and he did not keep a proper inventory record of the safety ticket books; therefore pursuant to the authority granted him under section 41 [2] of the 1939 Code he may compute petitioner's income by any method which clearly reflects such income. Further, respondent contends that petitioner may not take deductions for wages and rent because the allowance of such deductions would frustrate public policy. *19 The respondent does not appear to question the amount of "ins" reported by the petitioner but questions the fact that petitioner's gross profit percentage of "ins" is too low. The record contains a carbon copy of the tickets on which were recorded the daily bets. Envelopes containing three days' transactions were received in evidence and contain safety tickets showing the amount bet and the amount paid the winners. Petitioner offered respondent's agents one envelope, some 900 in all, for each day's business, containing a daily sheet reporting the total "ins," "outs," gross win, net win and expenses. Analysis sheets of "ins" and "outs" for each day for the years 1948, 1949 and 1950, together with petitioner's general ledger for the period, were also presented to respondent's agents. In addition to maintaining these records, the respondent contends it was incumbent upon petitioner to have kept and maintained the original of the winning tickets, a record indicating the identity of the winners, and an inventory of the ticket books in order that a determination could be made as to whether any of such books or sheets were missing. Respondent has adjusted petitioner's income under authority *20 of section 41 by arbitrarily taking 14 per cent of the "ins" as representing petitioner's true percentage of gross profit. His basis for this is the fact that the race tracks in Illinois retain 14 per cent of all bets placed. This assumption misconceives the petitioner's position as a bookmaker. He is not in the position of a stakeholder as a race track; he is gambling with the wagerer. His income varies from day to day depending on the number of winners among his customers. The record shows that on some days the petitioner's "ins" exceeded "outs" and he made a profit; on other days the reverse happened and he lost money. In James P. McKenna, 1 B.T.A. 326, 332, this Court analyzed the operations of a bookmaker and recognized the possibility of him losing money. See H. T. Rainwater, 23 T.C. - No. 54 (December 7, 1954). We realize that petitioner could have overstated his "outs" and that respondent is inclined to believe that a person engaged in an illegal business is more likely to report an incorrect income than taxpayers engaged in legitimate enterprises, but that fact may be determined only on the basis of evidence, not mere suspicion. We fail to see how an original *21 ticket could be any more persuasive in convincing respondent that petitioner had paid out money than the carbon copies which the petitioner has presented to him. Petitioner could just as easily have changed the original "outs" and could also adjust the inventory of the safety books. The identity of the winners is of doubtful value to the respondent, as the respondent would then be confronted with the problem of determining which party was telling the truth in the event a winner denied that he had won money from the petitioner. The issue resolves itself to one of whether or not we are going to believe the petitioner from the testimony he gives and records which he presents. We think the bookkeeping system employed by petitioner was adequate to reflect his income. The petitioner's forthright testimony, his extensive records and complete cooperation with the respondent's agents convince us that he was telling the truth and that his records fairly reflect his income. A second issue arises from respondent's amended answer in which he alleges that he erred in allowing deductions for wages and rent. The respondent contends that expenditures for wages and rent are not deductible under *22 section 23(a)(1)(A) of the 1939 Code, nor any other section of the 1939 Code, as the allowance of these deductions would frustrate the laws of Illinois which prohibit bookmaking. The amounts paid for rent and wages have been stipulated and are set out in our findings. In Anthony Cornero Stralla, 9 T.C. 801, 821, and G. A. Comeaux, 10 T.C. 201, 207; affd. 176 Fed. (2d) 394, we considered the question of whether the "legitimate expenses of an illegitimate business" constituted allowable deductions for income tax purposes and concluded that they did. On authority of those cases we hold that petitioner was entitled to deduct the amounts of rent and wages here involved. Since the petitioners' returns for 1948, 1949 and 1950 reflected their correct income, the petitioners were not liable for the additions to tax under section 293(a) asserted by respondent. The last issue to be considered is the addition to tax for failure to file declarations of estimated tax for 1948 and 1949 and for underestimating tax for 1948, 1949 and 1950. Petitioners have introduced no evidence showing reasonable cause for failure to file declarations for 1948 and 1949 *23 and are therefore liable for the additions to tax under section 294(d)(1)(A). They are also liable under section 294(d)(2) for the additions to tax for substantial underestimation of tax for 1948 and 1949. Decision will be entered under Rule 50. Footnotes
1. SEC. 54. RECORDS AND SPECIAL RETURNS. (a) By Taxpayer. - Every person liable to any tax imposed by this chapter or for the collection thereof, shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe. (b) To Determine Liability to Tax. - Whenever in the judgment of the Commissioner necessary he may require any person, by notice served upon him, to make a return, render under oath such statements, or keep such records, as the Commissioner deems sufficient to show whether or not such person is liable to tax under this chapter. * * *↩
2. SEC. 41. GENERAL RULE. The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *↩