ROBERT M. KALISCH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kalisch v. Commissioner
Docket No. 5663-85.
United States Tax Court
T.C. Memo 1986-541; 1986 Tax Ct. Memo LEXIS 59; 52 T.C.M. (CCH) 991; T.C.M. (RIA) 86541; November 12, 1986. Robert A. Fee, for the petitioner. Michael A. Rizzuto and Albert G. Kobylarz, for the respondent. WILLIAMS
MEMORANDUM OPINION WILLIAMS, Judge: The Commissioner determined a deficiency in petitioner's Federal income tax and additions to tax for negligence for the taxable year 1981 as follows: Section 6653(a)(1) [1]
Section 6653(a)(2)
Year
Deficiency
Addition to Tax
Addition to Tax
1981
$19,672.00
$984.00
50 percent of the
interest due on
an underpayment
of $19,672.00
*60 After concessions the issues we must decide are (1) the amount of petitioner's gambling income and losses in 1981 and (2) if petitioner's income exceeded his losses, whether any part of the underpayment of tax for 1981 was due to negligence or intentional disregard of rules and regulations. Some of the facts have been stipulated and are so found. Petitioner, Robert M. Kalisch, resided in Hasbrouck Heights, New Jersey at the time his petition was filed.Petitioner timely filed his Federal income tax return for 1981, showing gambling income of $41,979.40 and offsetting gambling losses of $41,979.40. Respondent, after allowance for a transcribing error, [2] accepted petitioner's calculation of his 1981 gambling income but disallowed his claimed deduction for gambling losses in its entirety. *61 For the first few weeks of 1981 petitioner lived with his wife in New York City. He and his wife separated on January 19, 1981 and petitioner lived with his parents in Hasbrouck Heights, New Jersey for the remainder of the year. Petitioner was divorced on or about May 20, 1981. Petitioner was a full-time law student during the second half of 1981. He did not attend school during the first half of the year, having been requested by the dean to take a leave of absence for academic reasons. Petitioner held two part-time jobs in 1981 to pay for school, sundries and remaining bills from his marriage.One of petitioner's part-time jobs was with Oxford Travel, Inc. Oxford Travel had five to eight employees and gross sales in excess of $2,000,000.00. Petitioner performed bookkeeping functions and served as vice president and treasurer of the corporation. In 1981 petitioner's income from his part-time jobs was $10,947.41. He owned few assets. During 1981 petitioner frequented racetracks, and particularly the Meadowlands racetrack. Although petitioner testified that he gambled only at the Meadowlands in 1981 and presented no evidence of gambling winnings or losses at other racetracks, *62 two of his long-time friends, Ronald Parris and Paul Kidney, testified that they attended other racetracks with him and gambled there in 1981. We find their testimony more credible than petitioner's. [3]
Petitioner was not a professional gambler but attended the Meadowlands racetrack several nights a week from January through May and in November and December 1981. Petitioner typically went to the track with a few hundred dollars and generated hundreds of dollars in winnings and losses in a typical evening. He often placed hundreds of dollars in bets on a single race. Petitioner used all of his gambling income and some of the money he earned working to place additional bets. The Meadowlands ran its harness or standardbred racing session *63 from January until early August and then closed for a few weeks to prepare for thoroughbred racing from Labor Day until New Year's. On most evenings there were 10 races at the Meadowlands track, with short intervals between races. Petitioner bet on five or six races in a typical evening. The fourth and last races were Tri-Fectas, on which the heaviest betting normally occurred and which resulted in the biggest payoffs. The last race ended around 11:15 p.m. and all patrons were required to leave the track soon afterward. As soon as each are started and immediately after the last race, cleaning crews swept tickets off of the floors. In addition to betting during the evening, there were "Early Bird" betting windows at the Meadowlands at which patrons could place bets between 11:30 a.m. and 5:00 p.m. for that evening's races. Petitioner sometimes placed bets at the "Early Bird" windows. When petitioner went to the Meadowlands, he bet most heavily on the Tri-Fecta races. Petitioner placed mainly exotic wagers: Tri-Fecta wheels and boxes and Exacta wheels and boxes. In a straight Tri-Fecta race, the bettor must pick three horses to finish in the correct order, first, second and *64 third. A Tri-Fecta wheel allows the bettor to pick one or two horses to finish in particular positions and combine them with all of the other horses in the field. For example, in a 10-horse Tri-Fecta race in which the bettor selected two horses to finish first and second and any of the remaining eight horses to finish third, he would purchase a ticket with eight bets on it. In a Tri-Fecta box the bettor picks any number of horses and his ticket includes all combinations of those horses finishing first, second and third. Exacta wheels and boxes are similar to Tri-Fectas except that the bettor need only select horses that will come in first and second. Petitioner kept no records of his straight betting activity but we are convinced that he also placed a significant number of straight bets in 1981. A straight bet requires the gambler to pick one horse to win, place or show. Joseph J. Malan, Director of Mutuels at the Meadowlands racetrack since its opening in 1976 and a former racetrack teller, testified based on his experience that gamblers who placed a lot of exotic wagers usually also placed large straight bets on their key horses. Petitioner's friend Ronald Parris saw petitioner *65 place straight bets in 1981. Petitioner had a system for betting on thoroughbred races at the Meadowlands in November and December 1981. He reviewed each horse's performance over the past two years, comparing earnings with the number of races each horse had entered. He then used the horses with the best ratios in his Exacta and Tri-Fecta wagers and also placed straight bets on them. Petitioner usually purchased a program when he went to the track. On the program he wrote the numbers of the horses on which he wanted to place bets but not the amount he wagered or the amount he won. Petitioner saved losing tickets and in the course of the audit of his 1981 return presented respondent with $75,515.00 in losing tickets, which he claimed to be his.Petitioner and his friends testified that petitioner did not pick up tickets from the floor. Malan confirmed that it would be difficult to collect a substantial number of tickets from the floors at the Meadowlands because they were swept immediately after the start of each race and after the last race.Petitioner, Parris and Kidney also testified that petitioner did not take losing tickets from his friends. We believe that petitioner did *66 not collect tickets from the floor at the Meadowlands but that petitioner did take tickets from Parris and Kidney and from his other friends who he frequently met at the track and who were not called to testify. We find that petitioner sustained gambling losses in 1981 but that his losses were not as large as he claims. During 1981, petitioner did not maintain a daily diary or similar record of his gambling activities or any contemporaneous record indicating his total gambling winnings and losses for the year. The records that petitioner kept to substantiate his claimed winnings and losses were losing tickets from 1981, which we have found are not all his, and W-2G income tax reporting forms that the racetrack was required to send to respondent when a bet paid off at least $600.00. Most winning bets did not require a Form W-2G. Unless a bet paid enough to require a Form W-2G, the Meadowlands did not provide receipts when it paid on winning bets. A single ticket might have both winning and losing bets on it. When a bettor presented a ticket for payment the teller took the ticket and the bettor lost his record of both winnings and losses. There was a computer screen in front *67 of the bettor, however, that flashed the amount of the gross payoff for the race and, when more than one winning ticket was presented, kept a running total of the gross payoff for the race. If a bettor wrote down the amount he wagered on each race and the amount of his gross winnings, he could maintain an accurate record of his total winnings and losses. To minimize his likelihood of receiving a Form W-2G and to avoid a 20 percent income tax withholding if the bet paid more than $1,000.00 with odds of at least 300 to 1, petitioner placed numerous small identical bets.Petitioner could not testify to the amount he won in 1981 that was not reported on a Form W-2G. Petitioner knew that he was required to report all gambling income and losses on his income tax return. He also believed, however, that it was not important to report exact winnings and losses because he believed that his losses exceeded his winnings. On his Federal income tax return petitioner reported as gambling income the amounts shown on his Forms W-2G plus $10,500.00. The $10,500.00 was approximately 30 percent of his winnings as reported on Forms W-2G. Petitioner calculated the amount of his gross income from wagers *68 that were not reportable by multiplying his winnings as reported on Forms W-2G by 30 percent which petitioner believed produced a reasonable estimate of his winnings for which a Form W-2G was not required and of which he had no records. For years in which he did not attend the track frequently, however, petitioner did not use his 30-percent rule because he thought his winnings would be offset by his losses. Petitioner had no idea how much he won during 1981 because he kept no records and placed all of his winnings in bets on subsequent races. Petitioner admitted that the 30-percent figure was no more than a guess. Petitioner was not a credible witness. His credibility was substantially undermined on cross-examination. Petitioner testified that he knew he was required to report all gambling income and losses but failed to report any in 1984 although he admitted he had gambled in that year. Petitioner also testified that he gambled only at the Meadowlands during 1981 but two of petitioner's friends who accompanied him to the track to gamble testified that they attended other racetracks with him in 1981. Petitioner falsely answered a question on his application to the New York *69 State Appellate Division Committee on Character and Fitness of Applicants for admission to the bar by stating that he had never been requested by any law school to discontinue his studies for any reason when in fact he had been requested to take a leave of absence during the first semester of 1981 for academic reasons. Petitioner reported $41,979.00 in gambling income on his 1981 tax return and claimed offsetting gambling losses of $41,979.00.In his notice of deficiency respondent accepted petitioner's income figure and disallowed petitioner's deduction for gambling losses for lack of substantiation. Respondent did not amend his answer to claim that petitioner received more than $41,979.00 in gambling winnings, but at trial and on brief, respondent urged that petitioner's claims to a deduction for gambling losses cannot be sustained because petitioner had additional unreported winnings in 1981 which necessarily exceeded his losses for the year. The burden of proving entitlement to a deduction generally rests on petitioner. Welch v. Helvering,290 U.S. 111, 112 (1933); *70 Rule 142(a). [4] When respondent introduces a new issue or matter, however, the burden of proof as to that issue is on him. Achiro v. Commissioner,77 T.C. 881, 890 (1981); Rule 142(a). Petitioner appeared for trial when the issue in the case was substantiation of his claimed $41,979.00 in losses. The issue of the magnitude of petitioner's winnings was not an issue joined for trial; petitioner put on no evidence of his winnings, and he had no opportunity to prepare his case on that issue. In this case, therefore, respondent bears the burden of proving petitioner's additional gambling winnings. Respondent elicited credible testimony on cross-examination showing that petitioner had additional unreported gambling income in 1981. First, petitioner's gambling partners, Parris and Kidney, testified that they attended racetracks other than the Meadowlands with petitioner in 1981. Petitioner had testified that the only racetrack he gambled at in 1981 was the Meadowlands and that he was not sure if he had gambled at casinos in 1981. On his 1981 tax return petitioner did not report winnings *71 and losses from any gambling activity other than bets he placed at the Meadowlands. Second, respondent established that petitioner placed small identical bets to avoid receiving Forms W-2G. Malan, the Director of Mutuels at the Meadowlands, confirmed that generally bettors place numerous small bets rather than a single larger bet to avoid having winnings reported to respondent.Petitioner also placed significant numbers of straight bets in 1981 but kept no record of them. Finally, respondent established that the $10,500.00 that petitioner reported as additional gambling winnings that did not require a Form W-2G was no more than a guess. Petitioner had no idea what his total winnings were for 1981. Petitioner now claims gambling losses of $75,515.00. On this record it appears that unreported winnings could be the only source of cash to fund these losses. Having few assets and little other income, petitioner relied almost exclusively on his gambling winnings to fund additional bets. The large volume of bets petitioner placed, his deliberate effort to avoid having his winnings reported to respondent, and the large amount of losses petitioner claims to have incurred convince us *72 that petitioner had some unreported gambling income for 1981. Respondent, however, bears the burden of establishing the amount of additional income that petitioner received from his gambling activities, and he has provided us with no evidence on which we could base an estimate of petitioner's additional income. Any finding on the amount of petitioner's 1981 gambling winnings, other than the amount accepted by respondent on audit, would be pure speculation. Respondent, however, argues that it does not matter that he cannot establish the amount of petitioner's additional gambling income because he knows that petitioner's income exceeded his losses and any losses would therefore be more than offset by income. In effect, respondent is suggesting that where he bears the burden of proof, we adopt a "netting" approach in gambling cases. Prior to 1934 there was no specific provision governing the deductibility of gambling losses and the Board of Tax Appeals adopted such an approach generally. A gambler's gross income was determined after subtracting disbursements from his receipts. McKenna v. Commissioner,1 B.T.A. 326 (1925); Frey v. Commissioner,1 B.T.A. 338 (1925). *73 Since 1934, however, when Congress adopted what is now section 165(d), [5] courts have rejected the netting approach. Taxpayers must report all gambling winnings as gross income and claim gambling losses as an itemized deduction to the extent of gambling income. McClanahan v. United States,292 F.2d 630, 631-632 (5th Cir. 1961); Gajewski v. Commissioner,84 T.C. 980, 982 (1985); Johnston v. Commissioner,25 T.C. 106, 108 (1955). [6] There does not appear to be any authority to permit a netting rule where respondent has the burden of proof. Respondent's failure to prove the amount of additional income causes us to hold that petitioner's gambling income was the amount reported on his 1981 tax return as accepted by respondent in his notice of deficiency. [7]
*74 Petitioner continues to bear the burden of proving the amount of his claimed gambling losses. See Donovan v. Commissioner,359 F.2d 64, 65 (1st Cir. 1966), affg. per curiam a Memorandum Opinion of this Court; Schooler v. Commissioner,68 T.C. 867, 869 (1977). [8]Section 6001 and the regulations thereunder require a taxpayer to keep permanent records sufficient to substantiate the amount of gross income, deductions and credits shown on his income tax return. Section 6001; section 1.6001-1(a), Income Tax Regs. Respondent has suggested that gamblers regularly maintain diaries of gambling winnings and losses to comply with section 6001. See Rev. Proc. 77-29, 1977-2 C.B. 538. *75 Petitioner did not maintain contemporaneous records of his wagering gains and losses during 1981. The only records we have of his gambling activities are (1) the Forms W-2G that the Meadowlands was required to send to respondent pursuant to section 1.6011-3, Income Tax Regs., when petitioner won $600.00 or more and (2) a box of losing tickets. He also argues that the short period of time between races, the voluminous number of bets he placed and the racetrack's policy of not providing receipts for winning tickets not requiring a Form W-2G made it too difficult for him to maintain accurate records of his winnings and losses and that we should rely on his and his witnesses' testimony that all of the losing tickets he presented belonged to him to conclude that he has substantiated his losses. Petitioner's contention that it was too difficult for him to maintain contemporaneous records of his gambling activities is without merit. Schooler v. Commissioner,68 T.C. at 870-871. Moreover, with petitioner's bookkeeping experience we do not believe that it was a very difficult task for him to keep records. If he had written down the total *76 amount he wagered on each race and the gross payoff as shown on the teller's computer screen he would have had records of his gross winnings and losses. In the absence of adequate records to substantiate his losses, petitioner asks us to rely on his testimony and that of his witnesses, two gambling partners and a racetrack official, to conclude that all of the losing tickets he presented were his. We are convinced that petitioner sustained gambling losses in 1981, but not to the extent he claims. Although we believe the testimony of petitioner and his friends that he did not pick up the losing tickets from the floor, we believe that he took some of the tickets from his friends. Petitioner was not a credible witness. His testimony was impeached or contradicted several times. Parris and Kidney were more credible witnesses but, since neither of them reported any of their gambling winnings or losses for 1981, we are inclined to discount their testimony that they did not give petitioner their losing tickets or see him take tickets from anyone else. Petitioner sometimes met other friends at the Meadowlands, and he did not show that they were not a source of some of petitioner's losing *77 tickets. In some gambling loss substantiation cases we have applied the rule in Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), to estimate the amount of losses incurred despite the absence of adequate records. See Green v. Commissioner,66 T.C. 538, 548 (1976); Drews v. Commissioner,25 T.C. 1354 (1956). Before we will apply the Cohan rule, however, there must be sufficient evidence in the record to show that some loss was in fact incurred. Stein v. Commissioner,322 F.2d 78, 83 (5th Cir. 1963); Schooler v. Commissioner,68 T.C. at 871. Here we are convinced that petitioner sustained gambling losses in 1981, but not to the extent he claims. We therefore apply the Cohan rule in this case. Because petitioner had only $10,174.41 in income in 1981 from non-gambling sources and did not establish any nontaxable source (e.g., loans, gifts, cash hoards) to account for the cash that funded his constant gambling activities well beyond 1981, we believe and hold that petitioner did not incur all of the losses that he claimed and that he incurred $10,000.00 in gambling losses for 1981. *78 Respondent also asserts that petitioner is liable for additions to tax for negligence or intentional disregard of rules and regulations under section 6653(a)(1) and 6653(a)(2) on the entire amount of the underpayment for 1981. We agree. Petitioner was aware of the rules requiring him to keep records of his gambling activities and to report all gambling income and losses. His failure to do so was therefore negligent within the meaning of section 6653(a). See Harris v. Commissioner,745 F.2d 378, 380 (6th Cir. 1984); Mack v. Commissioner,429 F.2d 182, (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Catalano v. Commissioner,81 T.C. 8, 17 (1983), affd. without published opinion sub nom. Knoll v. Commissioner,735 F.2d 1370 (8th Cir. 1984); Schroeder v. Commissioner,40 T.C. 30, 34 (1963). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the year here in issue.↩
2. In his notice of deficiency respondent determined that petitioner understated his gambling income by $2,979.00 because he failed to report income shown on a Form W-2G gambling winnings reporting form in the amount of $4,634.00. Respondent now concedes that petitioner included the winnings reported on the Form W-2G on his 1981 return. The confusion was due to a transcribing error by the teller at the racetrack.↩
3. Petitioner also may have gambled at casinos and placed bets with bookmakers in 1981. His friend Ronald Parris testified that petitioner did both on occasion but could not remember whether he had in 1981. Petitioner's friend Paul Kidney confirmed that petitioner sometimes placed bets with bookmakers but was not sure if he had in 1981. Petitioner admitted that he occasionally gambled at casinos but also could not remember if he had in 1981.↩
4. All rule references are to the Tax Court Rules of Practice and Procedure.↩
5. Section 165(d)↩ provides that "[l]osses from wagering transactions shall be allowed only to the extent of the gains from such transactions." 6. In Winkler v. United States,230 F.2d 766, 775-776 (1st Cir. 1956), however, the First Circuit drew a distinction between casual and professional gamblers and held that a professional gambler could continue to net his winnings and losses but a casual gambler could not. See Gajewski v. Commissioner,84 T.C. 980, 982-983 (1985).The parties have stipulated that petitioner is not a professional gambler, and thus, even under Winkler,↩ he may not net his gambling winnings and losses.
7. As noted above, see note 2, the additional income determined in the notice of deficiency was entirely attributable to a transcribing error and was conceded by respondent to have been reported by petitioner on his 1981 return.↩
8. In Schooler we also held that when a taxpayer has unreported gambling income, he must establish that his losses exceeded his unreported income to be entitled to any deduction. Schooler v. Commissioner,68 T.C. at 869↩.In that case, however, the taxpayer failed to report any gambling income and respondent determined an amount of additional income in his notice of deficiency. In contrast, in the case at bar, respondent accepted petitioner's reported income as correct and only at trial raised the possibility that petitioner had unreported gambling winnings. Respondent must therefore establish the amount of income that petitioner did not report.