T.C. Summary Opinion 2010-55

UNITED STATES TAX COURT

HOYT M. AND HELEN J. ORR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11017-07S.                    Filed April 26, 2010.

Hoyt M. and Helen J. Orr, pro sese.

<u>Horace Crump</u>, for respondent.

MORRISON, <u>Judge</u>:  This case was heard pursuant to the
provisions of section 7463 of the Internal Revenue Code in effect
when the petition was filed.[1]  Pursuant to section 7463(b), the
decision to be entered is not reviewable by any other court, and

------

[1]All section references are to the Internal Revenue Code
(Code) in effect for the year in issue, and all Rule references
are to the Tax Court Rules of Practice and Procedure, unless
otherwise indicated.

this opinion shall not be treated as precedent for any other case.

Respondent Commissioner of Internal Revenue (i.e., the IRS) determined a deficiency in the Orrs' 2004 federal income tax of $16,653 and a section 6662(a) accuracy-related penalty of $3,331. Petitioners Helen J. Orr (Orr) and Hoyt J. Orr (Orr's husband) disagree with the IRS's determination. The issues for decision are (1) whether the Orrs are entitled to a deduction for Orr's net gambling loss because she was a professional gambler rather than a casual gambler, (2) whether they are liable for an accuracy-related penalty for a substantial understatement of income tax for erroneously claiming the gambling-loss deduction and omitting certain retirement benefits, and (3) the extent to which the Orrs omitted certain retirement benefits from their return. We conclude that section 165(d) prohibits the Orrs from deducting the net gambling loss even though Orr was a professional gambler. We further conclude that the Orrs are not liable for the penalty because they acted in good faith and because (a) Orr's husband's disabling illness, (b) Orr's diminished mental capacity associated with severe depression, and (c) Orr's efforts to prepare the return together constitute reasonable cause for the errors. We will direct that the parties address the issue of whether the retirement benefits the Orrs did report on their return are a portion of the amount the IRS says

they omitted (which may mean that their taxable income and deficiency are lower than the IRS claims) or are a separate amount through a Rule 155 computational proceeding.

## Background

Orr suffered from depression in and about 2004, the year in issue. (The record before the Court does not describe Orr's mental condition precisely. We follow her in calling it simply "depression".) Her condition is associated with diminished mental capacity to address even moderately complex responsibilities. Her boss at the railroad for which she worked "saw [she] was more than a little disturbed", and sent her to a psychologist, who sent her to a psychiatrist. The psychiatrist put her on medication and directed that she take a leave of absence. Later, in 1999, the railroad granted her early retirement on account of permanent disability.[2,3]

---

[2]The record reflects that the Orrs received payments from the Railroad Retirement Board, but it does not reflect that they received any payments from a particular railroad. It seems possible, therefore, that Orr's employer did not itself grant her permanent disability benefits but instead helped her to apply for Railroad Retirement Board disability benefits. We infer that either organization would have required proof of disability.

[3]On brief, the IRS suggested that we should not believe Orr's trial testimony thus describing her diagnosis of severe depression on the ground that the testimony lacks corroboration. But the IRS did not question the substance of or basis for the testimony at trial or argue that it did not then have sufficient notice of the issue of Orr's depression and diminished mental capacity. We observe that the testimony is congruous with Orr's undisputed overall explanation for becoming a professional

(continued...)

Orr's depression appears to have arisen, at least in part, from a series of unfortunate circumstances that would have been a severe emotional drain for almost anyone. In 1994, Orr's husband was diagnosed with an illness believed to be terminal. Some time later, Orr's elderly, ill mother came to live with the Orrs. In 2000, Orr's mother died. In further explaining why she was depressed, Orr also noted that she lost two brothers in one year (about the time her mother died, we infer, although she did not say which year).

Orr's husband was present at trial but did not participate except to identify himself. He appears not to have had any significant economic activity during 2004. (Some of the retirement benefits at issue appear to have been his, and some of the interest and dividends the Orrs received and some of the shares they sold during 2004 may have belonged to him or the Orrs jointly.) We infer that he relied on Orr to prepare the Orrs' joint return, which both he and she signed. We find that his illness was reasonable cause for him to rely on Orr to prepare the return correctly.[4] Moreover, nothing before the Court

_____

[3](...continued) gambler and otherwise apparently credible, and we reject the IRS' challenge on this point.

[4]Each spouse is generally responsible for ensuring that a joint return the couple files is timely and correct. See LaBelle v. Commissioner, T.C. Memo. 1984-69.

suggests that he did not act in good faith. Substantially all of the issues in this case thus relate solely to Orr.

Orr's mental ability was, as she testified, "very, very limited" in 2004.[5]

Orr's economic activities for 2004 basically consisted of losing money to gambling and to scams. The Orrs also received retirement benefits, dividends and interest, and sold some shares.

Orr decided to take up gambling as a business around the end of 2003. The parties agree that she gambled professionally throughout 2004.[6] It appears that all of her gambling for the year was part of her gambling business.

---

[5]She also testified, and we accept, that to some extent her mental abilities were still diminished even at the time of trial.

[6]For tax purposes, the term "professional gambler" refers to a gambler who gambles as a "trade or business" (or simply a "business", as there appears not to be any distinction between a "trade" and a "business" for tax purposes). See, e.g., Hochman v. Commissioner, T.C. Memo. 1986-24. To be engaged in an activity as a business, one must be engaged in that activity (1) with regularity and continuity and (2) primarily for the purpose of profit. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). There need not actually be a profit or even a reasonable expectation of profit. Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without published opinion 702 F.2d 1205, 1983 U.S. App. LEXIS 30334 (D.C. Cir. 1983). Consequently, our use of the term "professional gambler" does not imply sophistication.

Orr had previously been a casual gambler.[7]  She apparently began to gamble heavily around the time her mother came to live with the Orrs.[8]  Her metamorphosis into a professional gambler was likely inspired by winning a $1.2 million jackpot at a casino in 2003.  Even though, as she explained, Orr still had a "lot of money" at the end of 2003, "it never registered on [her]".  She thought she "needed a job", but that nobody would hire her. Therefore, after consulting three other gamblers who said they made their living through gambling, she decided to take up gambling as a business.  She explained that her professional gambling activity differed from her earlier casual gambling activity in that she made a greater effort to learn to gamble profitably.

Although Orr became a professional gambler "to try to win some money", she now realizes that "it was not a smart decision." Orr found that she could not make money at blackjack or poker, games in which a skilled player may in some circumstances reasonably expect to profit over time.  Nor could she make money at craps, a game in which it is generally accepted that one playing under typical casino rules cannot reasonably expect to profit over time.  She then focused on slot machines.

---

[7]A casual gambler is a gambler who is not a professional gambler.  Hochman v. Commissioner, supra.

[8]Orr explained that her mother enjoyed being taken to the casino regularly.

Slot machines are devices that allow the player to engage in simple games of chance. It is generally accepted that a slot-machine player cannot reasonably expect to profit over time. Orr tried various misguided "strategies" in her attempt to make money playing slot machines. Not surprisingly, they failed. As discussed in more detail later, Orr had an overall loss of about $200,000 from gambling in 2004.

Orr had two other ventures during 2004.[9] These appear to have been scams of which she was a victim. She described one as "some kind of a program for grants and setting up a Web site, and they talked about how you could get grants to--for different things. They concentrated on low-income housing and housing prospects." The promoters' high-pressure tactics would have warned most people to stay away: Orr had to agree up front to pay for the program for 39 months, and the program was promoted to her through a seminar at which she "had to sign up then or not sign up." She signed up, and had expenses of $1,360 for the Web site business for 2004 but "was mentally unable to do anything with it" and never received any money through it.

Another, for which Orr received $1,920 in 2004 (which she reported as gross income) but "never even got my original money back" (suggesting that she had over time "invested" a greater

---

[9]The IRS does not dispute that these activities were businesses for tax purposes.

amount), was an arrangement that would supposedly "multiply" her investment every 90 days.  She now thinks that it "was just fed by people coming in and paying * * * to begin with", meaning that it was a Ponzi scheme.  We infer that she was correct.[10]

Orr prepared the Orrs' 2004 joint return (the "return") herself.  She used the tax-preparation software TurboTax to prepare the return.  She used the program because she wanted to avoid computational errors, not because she wanted the program to tell her the appropriate tax treatment of the gambling business (or any other item).  As she recalls (and as we find for purposes of deciding this case), TurboTax did not give her any warning that the amount of gambling losses she claimed might not be deductible.[11]

The Orrs reported the tax consequences of the three businesses on three respective Schedules C, Profit or Loss from Business (Sole Proprietorship), attached to the return.  These Schedules C are simple, and apparently required little accounting

---

[10]Orr did not mention this business in her petition, nothing suggests that the IRS had even informal notice that it would be addressed at trial, and the parties address it only briefly in the course of a general explanation of the entries on the Orrs' return.  Consequently, we conclude that it is not appropriate to redetermine the Orrs' gross income from that business, or to determine that they suffered any loss from it.

[11]We understand that Orr did not receive a warning to review her entries for the gambling business either on the ground that the deductibility of gambling losses is limited or on a less specific ground such as that the amounts were unusually large.

work to prepare. (Orr kept track of her winnings and losses for the gambling business by using a "player's club card" issued by a casino. Apparently, she gambled only at one casino, or perhaps one group of related casinos, during 2004.[12]) The IRS does not question the accuracy of the Schedules C except in arguing that the net gambling loss is nondeductible.

The Schedule C for the gambling business identified the business as "Gambling". It listed "Other income" of $909,058 (an amount, the parties have stipulated, consisting entirely of "gross winnings");[13] travel expenses of $10,780 on the designated line; and "Other expenses", described specifically as "gambling losses", of $1,113,766. It stated on the designated line that the net loss for the business was $215,488. Of this amount, the IRS challenges the deductibility of $204,708, which is the excess of the amounts Orr bet over her proceeds from the bets. We refer to this excess as the "net gambling loss".

---

[12]We understand that a "player's club card" is a card resembling a credit card by means of which a gambler enables a casino to automatically track the gambler's winnings and losses. See, e.g., Merkin v. Commissioner, T.C. Memo. 2008-146.

[13]It appears that the Orrs may have reported their gross receipts from gambling (including, for instance, all coins paid out of slot machines) as gross income, and their gross expenditures on bets (including, for instance, all coins inserted into slot machines) as losses. As discussed later, this practice may not have been technically correct, but the IRS does not challenge the practice's correctness, and the use of the practice probably does not in itself prevent the correct determination of their tax liability.

The Schedule C for her Web site business (described as
"computer web site and affordable homes for rent") listed five
items of expenses, each apparently a sum of monthly fees that she
paid to the promoter of the business, for Web site maintenance,
or for banking or similar services, which totaled to the $1,360
loss she reported for the business.  The Schedule C for her
business which now seems to have been a Ponzi scheme described
the business as "reading advertisements" and listed the $1,920 in
payments she received as both gross receipts and gross income.

The Orrs reported $16,470 on the return's line entitled
"Pensions and annuities", and, of this, $9,529 on the return's
next line, entitled "Taxable amount" (of the "Pensions and
annuities").  As we explain later, it is not clear whether these
entries reflect some portion of the Railroad Retirement Board and
Social Security benefits the couple received, which would mean
that the remainder of those amounts may contribute to a
deficiency; or whether the entries reflect other income, which
would mean that the entirety of the Railroad Retirement Board and
Social Security benefits may contribute to a deficiency.

The Orrs reported several thousand dollars in interest and
dividend income and about $100,000 in capital gains (from a sale
of shares of Norfolk Southern stock; as one line in the short-
term capital gain and loss schedule and another in the long-term
schedule indicate, sales of "various amsouth funds", which we

infer probably means mutual-fund shares; and capital-gain distributions, probably from the mutual funds) on the return.[14] These entries were not complex, and the IRS did not question them.

The Orrs did not report any further items on the return other than the standard deduction, personal exemptions, and credits for a small amount of tax already paid.

Orr deducted the entire net loss of $215,488 from the gambling business against all of the Orrs' other income for the year in computing the taxable income to be reported on the return. The result was a reduction of taxable income to zero.

We now turn to Orr's attempts to determine how to properly report her gambling business. She focused on the deductibility of gambling losses.

In filing the Orrs' return for 2003, a year in which she was a casual gambler, Orr had limited the Orrs' gambling-loss deduction to their gambling winnings. In response to a question by counsel for the IRS at trial, she explained that she filed this way not because of section 165(d) (a provision that she did not seem to fully understand even by then), but because an IRS publication explained that she should do so. She believed that

---

[14]Nothing before the Court suggests that receiving these gains reflected special skill or judgment.

the guidance in the IRS publication did not apply for 2004 because she had become a professional gambler.

Orr did not inquire as systematically or thoroughly as a sophisticated tax practitioner might. She did not examine the Code, tax regulations, or a treatise on tax law. But she satisfied herself that (1) she was a professional gambler (which is correct) and (2) therefore her gambling losses could offset her other income in the same manner as most other business losses would (which, as discussed later, is incorrect).

Orr made limited attempts to seek advice from tax professionals and from other professional gamblers.[15] She did not have a regular tax adviser at the time.

Orr visited an IRS office in Chattanooga, Tennessee. One IRS employee there, who appeared to be new, expressed doubt that she could claim the deduction; while another in the next cubicle said, as Orr recalls: "I've seen it done; I don't know how they do it, but I know that it's been done."

Orr did legal research. She went to the main library at a courthouse in Trenton, Georgia. The librarian there was unable to help Orr except to suggest that she go to the courthouse's tax

---

[15]These people were not called as witnesses. Given Orr's overall situation, it seems possible that she may not have fully understood their advice. We find, however, that she testified honestly, and that an honest misunderstanding of their advice (which we would accept in the light of her situation) would similarly inform our consideration of whether there was reasonable cause for the errors on her return.

library.  There was no librarian or anyone else at the tax
library to help her.  On her own, Orr found the case of
Commissioner v. Groetzinger, 480 U.S. 23 (1987), which we discuss
later.  She believed (as she continued to believe throughout the
proceedings in this case) that it meant that a professional
gambler can deduct gambling losses in the same manner that one
engaged in a business can generally deduct losses.  She did not
find any other materials there that she understood to be
relevant.

Orr went to a lawyer whom someone had recommended to her.
The lawyer explained that he was not a tax practitioner, but
recommended an accountant, Ben Hill.

Orr asked Hill whether she could claim the deduction.  She
recalls that Hill responded:  "I'm not saying it can't be done,
but I don't know."

Orr also approached another accountant.  This second
accountant had in the past filed returns for another gambler.
But she would not tell Orr about the tax treatment of gambling
losses because she wanted a fee and Orr did not want to pay her.
The other professional gamblers that Orr knew would not discuss
their tax affairs with her.

Orr relied in part on her past experience as a tax preparer. She had "done business taxes"[16] and understood that "you deduct business losses" (a proposition that is correct generally, but subject to numerous exceptions and limitations). She "used to be familiar with taxes" and had worked as a tax preparer at the mass-market tax-preparation company H&R Block. At trial, counsel for the IRS did not ask Orr about her work at H&R Block, and the record before the Court reveals very little about it. We do not know when she worked there, how long she worked there, what kinds of tax work she did there, or what kinds of skills they involved. We infer that she worked there well before 2004 because her early retirement for permanent disability was granted by the railroad, not H&R Block, and because she was unable to find any job after beginning to receive benefits.[17] We also do not know what further tax experience she may have had. Her legal research and analysis leading to this case, and the form and content of her arguments in it, indicate that her understanding of tax law is limited. See Kees v. Commissioner, T.C. Memo. 1999-41.

After filing the return, in preparing for this case (or the administrative proceedings which led to it) Orr obtained a copy

---

[16]We do not know what kind of "business taxes" these were. She could have, for instance, merely prepared simple Schedules C to IRS Forms 1040, U.S. Individual Income Tax Return, to report individuals' business activities.

[17]We do not know what Orr's job at the railroad was, but the record does not indicate that it was tax related.

of <u>Commissioner v. Groetzinger</u>, <u>supra</u>, from legal-research provider Westlaw.  The parties attached this copy to the stipulation.  She also read the Web site "Professional Gambler Status", at www.professionalgamblerstatus.com, and attached an excerpt from its "Case Law" page, to the Orrs' pretrial memorandum.  The Web site discusses various differences in the tax treatment of casual and professional gamblers and reproduces several gambling-related Tax Court opinions.

The Web site "Professional Gambler Status" repeatedly and consistently states that net gambling losses are not deductible, for professional as well as casual gamblers, and explains what section 165(d) is and what it means.  But since the Web site is fairly large and complex, we infer that one suffering from diminished mental capacity might well fail to recognize the significance of the Web site's material about net gambling losses' being nondeductible for professional as well as casual gamblers.  The Court asked Orr whether she had seen parts of the Web site that referred to section 165(d), which by that point in the trial had been repeatedly described to her as the section of the Code that, in the IRS' view, would generally disallow net gambling losses.  She said she had, but that she had understood other parts of the site to be more important.  We accept this explanation.

The IRS issued a notice of deficiency to the Orrs for 2004. The explanatory material accompanying the notice showed that the deficiency and penalty on the notice resulted from the following determinations. One determination appears to be that the Orrs received the $30,391 in now-stipulated retirement benefits discussed earlier, that the now-stipulated taxable portion of those benefits was $25,832, and that this entire taxable portion was to be added to their income because none of it had been shown on the return.[18] Another determination was that no deduction was allowed for the net gambling loss. A third determination was

_____

[18]The IRS Notice CP2000 accompanying the notice of deficiency asserts as follows that the Orrs failed to report any of the stipulated retirement benefits:

| Item No. | Issue | Received From | Account Information | Amount Reported to IRS by Others | Amount Included on Your Return | Difference |
|---|---|---|---|---|---|---|
| 1 | Social Security/ Railroad Retirement | US Railroad Retirement Board | SSN [for Orr] Form 1099-SSA | $ 17,784 | – | – |
| 2 | Social Security/ Railroad Retirement | Social Security Administration | SSN [for Orr's husband] Form 1099-SSA | $ 12,607 | – | – |
| | | Social Security/Railroad Retirement Total [Fn. ref. omitted.] | | $ 30,391 | $ – | $ – |

In another table, it asserts that the taxable amount of these benefits is $25,832:

| Changes to Your Income and Deductions | Shown on Return | Reported to IRS, or as Corrected | Difference |
|---|---|---|---|
| Social Security/Railroad Retirement | $ 0 | $ 25,832 | $ 25,832 |

that a section 6662 accuracy-related penalty was imposed for the substantial understatement of income tax due to these alleged errors.

The record before the Court does not indicate that Orr had notice before she filed the 2004 return that she was incapable of complying with her tax obligations on her own.  For example, it does not indicate that any tax-return errors for previous years had been revealed by an audit.

The Orrs timely filed a petition for redetermination of their deficiency in which they "request[ed] that professional gambler status be granted."  The IRS agrees that Orr's gambling activity was a business in 2004.  Thus, the contention in the petition is moot.  Even so, the main issues actually relevant to the Orrs' tax liability for 2004--the omission of certain retirement benefits, the deductibility of net gambling losses, and the existence of reasonable cause to except the Orrs from an accuracy-related penalty for errors on their return--are properly before the Court because the IRS presented them in its pretrial memorandum[19] and addressed them without objection at trial and in its posttrial brief.[20]

---

[19]We appreciate the IRS' introduction of these issues, which are genuine issues that the Orrs appear not to have grasped on their own.  It likely helped them to more fully present their case to the Court.

[20]Since the Orrs have the burden of proof on these issues
(continued...)

## Discussion

I.  <u>Deductibility of Net Gambling Loss</u>

The Orrs present several theories why they are entitled to deduct their net gambling loss (i.e., the $204,708 excess of the amounts Orr bet over her proceeds from bets).[21]  The IRS argues that section 165(d), which provides that "[l]osses from wagering transactions shall be allowed only to the extent of the gains from such transactions", makes the loss nondeductible, noting that we held in <u>Valenti v. Commissioner</u>, T.C. Memo. 1994-483, that section 165(d) denies professional gamblers deductions for their net gambling losses.[22]  We agree with the IRS, and we

---

[20](...continued)
under Rule 142(a)(1), they benefit from our decision to consider the issues at all.

[21]Since the Orrs are representing themselves, we have construed their arguments liberally.  Cf., e.g., <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007).  Some of the Orrs' theories of why their net gambling loss should be deductible are procedurally improper because the Orrs raised the theories only in their reply brief.  Since we can determine on our own that these theories are not correct, we need not consider whether to reject them as untimely or give the IRS an opportunity to respond to them.

[22]The IRS does not dispute that Orr's gambling-related travel expenses are deductible.  Courts have disagreed on whether the sec. 165(d) limitation applies only to net losses from bets themselves (for instance, an excess of money paid into a slot machine over money paid out from the slot machine) or also to other expenses (such as travel expenses) that constitute part of an overall loss from a gambling activity.  A recent IRS internal memorandum, AM2008-013, summarizes precedent on each side of the issue and concludes that because the statute refers to wagering "transactions", which the memorandum asserts to be a narrower term than "activity" or others used in comparable provisions,
(continued...)

explain our reasoning in the course of addressing the Orrs'
various arguments.

The Orrs argue that the status of Orr's gambling as a
business made the net gambling loss deductible. In support of
this argument, they present Commissioner v. Groetzinger, 480 U.S.
at 35, Clemons v. Commissioner, T.C. Summary Opinion 2005-109,
and Panages v. Commissioner, T.C. Summary Opinion 2005-3.[23]

However, Groetzinger, Clemons and Panages do not focus on
whether a net gambling loss arising in a gambling business is
deductible.[24] Groetzinger held that gambling losses to the extent

_____

[22](...continued)
sec. 165(d) addresses only net losses from bets themselves as
described above, which we discuss as "net gambling losses". For
this case, we accept the parties' agreement that the Orrs'
gambling-related travel expenses are not limited by sec. 165(d)
because this position has a reasonable basis in law. (An
internal memorandum does not normally bind the IRS, but it may
cite law and contain reasoning that can inform our consideration
of a case.)

[23]Although sec. 7463(b) prohibits us from treating Clemons
v. Commissioner, T.C. Summary Opinion 2005-109, and Panages v.
Commissioner, T.C. Summary Opinion 2005-3, as precedent, meaning
that we cannot base our decision in this case on having made a
similar decision on comparable facts in those cases, we consider
the law they address and the reasoning they contain in deciding
whether the Orrs' treatment of their net gambling loss was
correct.

[24]We understand, however, how Orr, who suffers from
diminished mental capacity, might infer from them that net
gambling losses are deductible. Commissioner v. Groetzinger, 480
U.S. 23 (1987), discusses the status of a gambler as a
professional and a deduction for gambling losses; Clemons and
Panages discuss the status of gamblers as casual gamblers and
unavailability of certain tax benefits. The Web site

(continued...)

of gambling winnings are deductible in computing alternative minimum taxable income (under the significantly different alternative minimum tax rules in effect for 1978), and discussed more generally what kinds of activities constitute a business for tax purposes.  Clemons and Panages both concluded that a casual gambler must include gambling winnings in gross income and may deduct gambling losses that do not exceed winnings as an itemized deduction.[25]  As discussed later, treatment of a deduction as "above-the-line" or "itemized" affects various other tax items.

_____

[24](...continued)
"Professional Gambler Status", from whose "Case Law" page Orr printed excerpts from Clemons and Panages, uses bold text for parts of the cases about status of gambling activities as a business and about gambling losses being deducted on Schedule A, Itemized Deductions, or Schedule C of Form 1040.

[25]Commissioner v. Groetzinger, supra at 32, briefly and indirectly discusses sec. 165(d)'s limitation on net gambling losses, stating in dicta:

> the confinement of gambling-loss deductions to the amount of gambling gains, a provision brought into the income tax law as § 23(g) of the Revenue Act of 1934, 48 Stat. 689, and carried forward into § 165(d) of the 1954 Code, closed the door on suspected abuses * * * but served partially to differentiate genuine gambling losses from many other types of adverse financial consequences sustained during the tax year. * * *

Note 3 in Panages v. Commissioner, supra, states that "If petitioner qualified as a professional gambler for purposes of sec. 162, she still could claim her losses only to the extent she had gains.  Sec. 165(d); Praytor v. Commissioner, T.C. Memo. 2000-282."

We infer that Orr did not understand the significance of the foregoing passages.

In their posttrial brief, the Orrs noted that there is no mention of section 165(d) in section 162 (subsection (a) of which provides that "There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business"). Their argument, we infer, is that section 165(d) does not limit the scope of section 162.[26] Although an explicit cross-reference might make the law easier to understand, we reject this argument.[27]

Section 165(d) provides that "Losses from wagering transactions shall be allowed only to the extent of gains from such transactions."[28] The word "wagering" is synonymous with "gambling". Tschetschot v. Commissioner, T.C. Memo. 2007-38 (generally, and in the federal tax context).

---

[26]The brief states in relevant part: "In the case of a taxpayer not engaged in the trade or business of gambling, losses are allowable as a miscellaneous itemized deduction, but only to the extent of gains. Professional gamblers have qualified as being eligible to file as a business according to tax code 162(a). NO WHERE in irc code 162 does it mention 165(d)."

[27]It appears that, at least until trial, Orr did not merely draw an incorrect conclusion from the absence of a cross-reference to sec. 165(d) but failed more generally to understand the significance of that section and its relation to other tax rules. Consequently, we need not focus on the absence of a cross-reference in deciding whether Orr's misunderstanding of law is consistent with the reasonable-cause exception to the accuracy-related penalty.

[28]Sec. 1.165-10, Income Tax Regs., provides that this limitation of wagering losses to wagering gains applies on a year-by-year basis rather than over a shorter period.

Section 165(d) denies a deduction for a net gambling loss even if the loss is also described as a kind of generally deductible item, such as a section 162(a) business expense, a section 165(a) loss from a transaction entered into for profit, or a section 212 expense for the production of income.  This broad interpretation of section 165(d) is supported by its history, the plain language of the Code, and, as discussed earlier, judicial precedent.

Congress first enacted the language now reflected in Section 165(d) as section 23(g) of the Revenue Act of 1934 (1934 Act), ch. 277, 48 Stat. 689.  According to committee reports, Congress wished to reverse caselaw that allowed legal gamblers to deduct their gambling losses against nongambling income:[29]

> Under the interpretation of the courts, illegal gambling losses can only be taken to the extent of the gains on such transactions.  A similar limitation on losses from legalized gambling is provided for in the bill. Under the present law many taxpayers take deductions for gambling losses but fail to report gambling gains.  This limitation will force taxpayers to report their gambling gains if they desire to deduct their gambling losses.

H. Rept. 704, 73d Cong., 2d Sess. 22 (1934), 1939-1 C.B. (Part 2) 554, 570, and S. Rept. 558, 73d Cong., 2d Sess. 25 (1934), 1939-1 C.B. (Part 2) 586, 605 (following the House committee's language, except in referring to the bill as the "House bill").  Thus, the

---

[29]See Beaumont v. Commissioner, 25 B.T.A. 474, 482 (1932), affd. 73 F.2d 110 (D.C. Cir. 1934), for a discussion of gambling taxation before the 1934 Act.

committee reports provide no support for an argument that Congress
intended to express any distinction between professional and
casual gambling in enacting section 23(g) of the 1934 Act.
Neither does any other authority of which we are aware.

Section 23 of the 1934 Act is entitled "Deductions from Gross
Income". Its flush language is simply "In computing net income
there shall be allowed as deductions:". It set forth most of the
deductions allowable against gross income in computing net (i.e.,
taxable) income.[30] These included, among others, business expenses
(section 23(a) of the 1934 Act, ch. 277, 48 Stat. 688) and losses
on transactions entered into for profit (sections 23(e)(1) and (2)
of the 1934 Act, ch. 277, 48 Stat. 689).

The location of section 23(g) of the 1934 Act alongside the
other subsections of section 23, which in turn set forth most of
the deductions allowed by the Code (including the deduction for
business expenses), confirms what we believe to be the most
logical reading of section 23(g): section 23(g) limited all net
gambling losses, even those that could also be described as
another kind of generally deductible item, such as business

---

[30]The deductions not addressed in sec. 23 of the Revenue Act
of 1934 (the "1934 Act") were generally limited to special
classes of taxpayers, such as trusts and estates, and lack
relevance to gambling transactions as such (addressing instead,
for example, distributions by trusts and estates). See sec.
162(b) of the 1934 Act, ch. 277, 48 Stat. 728.

expenses.[31]  The 1934 Act did not contain a provision similar to current section 7806(b), which provides that "No inference, implication, or presumption of legislative construction shall be drawn or made by reason of the location or grouping of any particular section or provision or portion of this title".

Section 23(g) of the 1934 Act came into the Internal Revenue Code of 1939 as subsection (h) of section 23.  Ch. 2, 53 Stat. 13. Section 23 of the 1939 Code was still entitled "Deductions from Gross Income" and still contained most of the deductions allowed under the income-tax law.

The Internal Revenue Code of 1954, ch. 736, 68A Stat. 49, brought what is now section 165(d) to its present location within section 165, a section that addresses "Losses".  The 1954 Code, like the currently effective Internal Revenue Code of 1986, placed section 165 in part VI of subchapter B of chapter 1, a part entitled "Itemized Deductions for Individuals and Corporations". The 1954 Code placed some other kinds of deductions that might

_____

[31]It is a longstanding maxim of statutory construction that if two statutes overlap, the later enacted statute prevails over the earlier to the extent of the inconsistency. Posadas v. National City Bank, 296 U.S. 497, 503 (1936).  Business losses as such had long been deductible at the time the 1934 Act introduced disallowance of net gambling losses.  (Until 1939, Congress' regular practice was to enact a comprehensive tax statute including incremental changes from the prior version rather than to enact a statute containing only the incremental changes to a longstanding code.  Even so, the maxim is relevant because it reflects, among other considerations, the legislature's ability to consider an older rule and take care in drafting the newer rule to overlap it or not.)

address gambling losses, such as section 162 business expenses, in other sections of part VI. But other kinds of deductions that might also address gambling losses, such as the section 212 deduction for expenses for the production of income, were placed in part VII of subchapter B of chapter 1, a part that was entitled "Additional Itemized Deductions for Individuals".[32]

Viewed in isolation, the 1954 Code's rearrangement of the 1939 Code's deduction-related provisions may appear to indicate a significant change in the relationship of those provisions to each other. The designation of section 165(d) as a subsection of section 165 (which, unlike section 23 of the 1934 Act and 1939 Code, contains only a few of the kinds of deductions the income-tax law allows) might suggest that section 165(d) does not limit deductions allowable under other sections of the Code (such as section 162). Similarly, the location of section 165(d) within part VI of subchapter B of chapter I might suggest that it does

---

[32]Valenti v. Commissioner, T.C. Memo. 1994-483, describes the history of what is now sec. 165(d):

Moreover, the provisions in section 165(d) first appeared in our revenue law as section 23(g) of the Revenue Act of 1934, ch. 277, tit. I, 48 Stat. 689.[4]
* * *

[4]The provisions were redesignated section 23(h) in the Revenue Act of 1938, ch. 298, 52 Stat. 447, 461, and continued as such in the 1939 Code until they became the current section 165(d) as enacted in the 1954 Code.

not limit deductions allowable under other "parts" of the Code (such as part VII, which contains section 212).

However, the House and Senate reports on the 1954 Code stated that "Rules for the treatment of losses contained in various subsections of section 23 of the 1939 Code have been brought together in [section 165].  * * * No substantive change is made by this rearrangement."  H. Rept. 1337, 83d Cong., 2d Sess. A46 (1954); S. Rept. 1622, 83d Cong. 2d Sess. 198 (1954).  In addition, the 1954 Code introduced section 7806(b) (inference of legislative construction not to be drawn from location or grouping of provisions of Code) in its present form, carrying forward similar language from section 6 of the introductory "enacting clause" of the statute containing the 1939 Code (ch. 2, 53 Stat. 1).  Section 7806(b) confirms that the designation of section 165(d) as a subsection of a section addressing only a particular kind of deduction (the deduction for certain "losses") does not in itself prevent section 165(d) from applying to other kinds of deductions.[33]

---

[33]Sec. 165(d)'s use of sec. 165's term "losses", rather than the sec. 162 and 212 term "expenses", might also in isolation suggest that the sec. 165(d) limitation does not extend to deductions described in the latter sections.  But we and other courts have consistently held that net gambling losses incurred in a business are nondeductible under sec. 165(d) and its predecessors.  See, e.g., Nitzberg v. Commissioner, 580 F.2d 357, 358 (9th Cir. 1978); Valenti v. Commissioner, supra; Skeeles v. United States, 118 Ct. Cl. 362, 371-372, 95 F. Supp. 242, 246-247 (1951).  Although gambling losses may be described as, for
(continued...)

II.  Applicability of Section 165(d) to Orr's Gambling

The Orrs make a comment in their posttrial brief that we construe as an argument that section 165(d) should not be applied to Orr's gambling activity because no meaningful distinction can be drawn between her gambling activity and other activities whose net losses are undisputedly deductible.  The brief says:

> When Mr. Eric Evans, of the IRS office in Birmingham, interviewed us for our preliminary court case,[34] we mentioned losing a lot of money in the stock market[35] and Mr. Evans said "another form of gambling" and so it is, yet, these losses are deductible.  Webster's defines gamble as to play a game for money, to take risks in the hope of getting better results than by some safer means; to stake one's money.  Any business anywhere in the world is a risk, i.e., gamble.  If you can name one that is not a risk, I and many others would like to participate in that business.
>
> Conway Twitty (Harold Jenkins) started a restaurant (Twitty Burgers) with 75 of his friends investing in the business.  The business went under in 1971 and Mr. Twitty reimbursed his friends for their losses and

---

[33](...continued)
instance, "ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business" (sec. 1.162-1, Income Tax Regs., describing sec. 162 business expenses), nothing suggests that they thereby cease to be "losses".

[34]At trial, Orr testified that "Eric in the Appeals court" gave her the copy of Commissioner v. Groetzinger, 480 U.S. 23 (1987), which the parties attached to their transcript.  We infer that Eric Evans was an officer in the IRS Office of Appeals, which offers taxpayers an opportunity to attempt to resolve their disputes with the IRS in a relatively informal setting.

[35]Nothing else in the record addresses these losses.  We infer they may have occurred in years other than the one in issue.

claimed and was allowed the reimbursements as business expenses.[36]

We reject this argument.  Even if it is difficult to define the outer reaches of the term "gambling", it is undisputed that what Orr did was gambling.  To hold that playing a slot machine is not gambling would be an absurd interpretation of the word "wagering" in section 165(d).[37]  Furthermore, such a holding would be tantamount to saying that there is no activity that qualifies as gambling, which would render section 165(d) surplus language. See Calafati v. Commissioner, 127 T.C. 219, 229 (2006)  ("all

_____

[36]The Court characterized the reimbursements as expenses of preserving the famous country singer's reputation, which we found to be essential to his country music business.

Had Conway not repaid the investors
His career would have been under cloud,
Under the unique facts of this case
Held: The deductions are allowed.

Excerpt from "Ode to Conway Twitty", Jenkins v. Commissioner, T.C. Memo. 1983-667 n.14.

[37]The Orrs appear to argue that defining gambling to include slot-machine playing would require the equally absurd result that every business is "gambling".  It does not.  Courts interpreting "gambling" for tax purposes have followed common understandings of the term which do not include most businesses.  For instance, betting on horse races (Schooler v. Commissioner, 68 T.C. 867, 867-868 (1977)), bookmaking (Winkler v. United States, 230 F.2d 766 (1st Cir. 1956)), playing poker (Tschetschot v. Commissioner, T.C. Memo. 2007-38), and playing slot machines (Chow v. Commissioner, T.C. Memo. 2010-48; LaPlante v. Commissioner, T.C. Memo. 2009-226) are all "gambling".  But speculating in junk bonds is not "gambling".  Jasinski v. Commissioner, T.C. Memo. 1978-1.  See also Skeeles v. Commissioner, supra at 365-367, 95 F. Supp. at 242-243 (betting on sports, cards, and dice is gambling).

parts of a statute, if at all possible, are to be given effect"
(quoting Weinberger v. Hynson, Westcott & Dunning, Inc., 412 U.S.
609, 633 (1973))); Schoneberger v. Commissioner, 74 T.C. 1016,
1024 (1980).

III. Does Section 165(d) Unconstitutionally Discriminate Against
Gambling Businesses?

The Orrs ask in their brief:

How can a business (professional gambler) be
subject to self employment tax and yet be unable to
claim business deductions as any other business. It is
the only business the IRS places the restriction that
can't show a loss. What part of the law makes that
distinction and is that constitutional? We understand
our laws are created by Congress, but shouldn't the
rules made by the IRS be governed by someone?

As we have discussed, section 165(d) contains the gambling-
loss limitation relevant to this case. Section 165(d) is a part
of the Internal Revenue Code, a statute enacted and amended from
time to time by Congress. Through section 7805 and other more
specific delegations of authority, Congress has authorized the
Department of the Treasury, of which the IRS is a part, to issue
official interpretations of the Code. But we do not base our
decision that a professional gambler is not entitled to deduct
gambling losses in excess of gambling gains upon an IRS
interpretation. We base it on the language and history of the
Code and a longstanding principle of statutory construction.

We acknowledge that the Internal Revenue Code treats gambling
less favorably than most other businesses. But we have previously

rejected the argument that the Constitution does not permit Congress to single out the business of gambling for unfavorable tax treatment.  See Valenti v. Commissioner, supra; cf. Gordon v. Commissioner, 63 T.C. 51, 80-81 (1974) (addressing unfavorable treatment of gambling income under "income averaging" provisions of prior law), revd. in part on other grounds 572 F.2d 193 (9th Cir. 1977).  In Valenti, we noted that "the due process clause of the Fifth Amendment has been construed as imposing an equal protection requirement in respect of classification" by the federal government, but that the Supreme Court has recognized legislatures to have wide powers to distinguish between even closely related businesses in the exercise of their taxing powers. We cited the extensive history of gambling set forth in Skeeles v. United States, 118 Ct. Cl. 362, 365-368, 95 F. Supp. 242, 242-244 (1951) in observing that "Plainly, a classification that differentiates the business of gambling from other business [may be justified in that it] has 'a rational basis, and when subjected to judicial scrutiny * * * must be presumed to rest on that basis if there is any conceivable state of facts which would support it.'"  Valenti v. Commissioner, supra (quoting Carmichael v. S. Coal & Coke Co., 301 U.S. 495, 509 (1937)).

IV. Deductibility of the Net Gambling Loss "Above the Line"

    A. The Classification of the Orrs' Net Gambling Loss as an "Above-the-Line Deduction" Does Not Affect the Section 165(d) Limitation

The Orrs claimed their gambling losses on Schedule C, a standard preprinted attachment to an individual income tax return (IRS Form 1040). The instructions for Form 1040 and Schedule C provide for deductions listed on Schedule C to be claimed "above the line", which means that the deductions are subtracted in computing adjusted gross income. As we explain later, the Code does provide for a professional gambler to deduct allowable gambling losses "above the line".

The Orrs stated in their pretrial memorandum that they believed the issue in this case is whether "To allow or disallow gambling losses above the line." It is not. The IRS did not dispute that the Orrs could deduct the allowable losses "above the line". The Orrs did not explain at trial or in their posttrial briefs why they thought the IRS disagreed with an above-the-line deduction for their gambling losses.

We infer that the Orrs believed that deducting the losses "above the line" would except the losses from the limitation of section 165(d). Such a belief would not be correct. It is well established that section 165(d) applies both to professional gamblers, who, as discussed later, deduct their allowable gambling losses above the line, and to casual gamblers, who deduct their

allowable gambling losses below the line. See, e.g., <u>Tschetschot v. Commissioner</u>, T.C. Memo. 2007-38 n.7 (citing <u>Boyd v. United States</u>, 762 F.2d 1369 (9th Cir. 1985), <u>Offutt v. Commissioner</u>, 16 T.C. 1214 (1951), and <u>Heidelberg v. Commissioner</u>, T.C. Memo. 1977-133).

  B. <u>Consequences of Deducting Business-Related Gambling Losses Above the Line</u>

A deduction which is subtracted from gross income to determine adjusted gross income (AGI) is known as an "above-the-line" deduction because it is taken into account above a conspicuous line at the end of the section of Form 1040 relating to AGI. Section 62(a) lists the kinds of deductions that are claimed "above the line." One set of above-the-line deductions is "The deductions allowed by this chapter (other than by part VII of this chapter)[38] which are attributable to a trade or business carried on by the taxpayer, if such trade or business does not consist of the performance of services by the taxpayer as an employee." Sec. 62(a)(1). Therefore, a professional gambler

---

[38]The Code is divided into "subtitles", "chapters", "subchapters", "parts", "subparts", and "sections". (Sec. 7806(b), discussed earlier, explains that this classification does not in itself have any legal effect.) The subchapter to which the quoted passage refers is entitled "Computation of Taxable Income" (containing, as of the year at issue, secs. 61-291), and the "part" whose deductions it excludes is entitled "Additional Itemized Deductions for Individuals" (secs. 211-224).

claims allowable gambling losses and expenses as deductions above the line.[39]

Deductions other than (1) above-the-line deductions or (2) the section 151 deduction for personal exemptions are known as "itemized deductions". Sec. 63(d). (An individual may claim "itemized deductions" only if he or she does not claim the "standard deduction". Sec. 63(e).) Therefore, a casual gambler's gambling losses and expenses are normally itemized (i.e., "below-the-line") deductions. See sec. 62(a); Hochman v. Commissioner, T.C. Memo. 1986-24.

Above-the-line deductions and itemized deductions both generally reduce taxable income dollar-for-dollar. But an above-the-line deduction for a gambling loss is sometimes more valuable than an itemized deduction because (a) a taxpayer is entitled to claim an above-the-line deduction even if the standard deduction is also claimed and (b) an above-the-line deduction reduces AGI,

---

[39]Since sec. 62(a)(1) requires merely that the deductions be attributable to a trade or business, not that they be deductible under sec. 162, "Trade or Business Expenses", this result does not depend on whether the professional gambler's deduction for gambling losses (1) arises under sec. 162(a) and is limited by sec. 165(d), see Valenti v. Commissioner, supra, or (2) both arises under and is limited by sec. 165(d), see Humphrey v. Commissioner, 162 F.2d 853, 855-856 (5th Cir. 1947) (holding that sec. 23(h) of the 1939 Code, a predecessor to sec. 165(d), both allowed gambling losses without regard to profit motive and limited them to gambling gains), affg. in part and revg. in part a Memorandum Opinion of this Court.

and AGI is used to limit certain tax benefits.[40]  See <u>Calvao v. Commissioner</u>, T.C. Memo. 2007-57 n.6 (discussing reduction of certain itemized deductions by reference to adjusted gross income under section 68); cf., e.g., sec. 170(b)(1)(A), (B), (F) (relating to the deduction for charitable contributions).

We noted earlier that Orr may have reported the Orrs' gross receipts from gambling as gross income and their gross expenditures on bets as losses, and that even if technically incorrect this practice probably does not in itself affect their tax liability.  This follows in part from the fact that Orr, as a professional gambler, deducts allowable gambling losses above the line.  We and other courts have from time to time held that a gambler's gross income is properly determined by reducing gross receipts from a particular bet, and, in the case of a professional gambler, a series of related bets, by the amount wagered on those bets.  (Any net loss would still be subject to section 165(d).) See <u>Winkler v. United States</u>, 230 F.2d 766, 770-776 (1st Cir. 1956) (offsetting costs of related winning and losing bets by professional gamblers against their proceeds from those related

---

[40]Itemized deductions generally are disallowed to the extent of 3 percent of AGI over a threshold amount for a taxpayer whose income exceeds that amount, sec. 68(a), and certain itemized deductions, classified as "miscellaneous itemized deductions", are disallowed to the extent they do not exceed 2 percent of total AGI, sec. 67(a).  But these disallowance rules do not apply to gambling losses.  See secs. 67(b)(3), 68(c)(3); H.R. Conf. Rep. 99-841 (Vol. II), at II-34 (1986), 1986-3 C.B. (Vol. 4) 1, 34; <u>Whitten v. Commissioner</u>, T.C. Memo. 1995-508.

bets in determining gross income); McKenna v. Commissioner, 1 B.T.A. 326, 332-333 (1925); Hochman v. Commissioner, supra (offsetting the cost of each of a casual gambler's winning bets against his proceeds from that bet in determining his gross income).  These cases suggest that the Orrs may have overstated their gross income and gambling losses by equal amounts by treating the gross proceeds of winning bets as gross income and treating the cost of making those bets as losses.  Equal overstatements of gambling gross income and losses would not change the net gambling loss disallowed under section 165(d), and would increase the deductible gambling loss dollar-for-dollar with the overstatements.  Since even an itemized deduction for net gambling losses is not limited by sections 67(b)(3) and 68(c)(3), such overstatements would not change taxable income.  Since a professional gambler's allowable gambling-loss deduction is claimed above the line, the overstatements would not change AGI.[41] We thus lose nothing by accepting the statement on the Orrs' return that they had $909,058 in "gambling winnings", the same amount of gross income, and $1,113,766 in gambling losses from their gambling business.

_____

[41]Nothing suggests that the Orrs have any tax item whose treatment would be affected by the amount of their gross income as such.  The extent to which the Orrs would be taxable on their Railroad Retirement Board and Social Security benefits may depend in part on their "modified adjusted gross income", which, like AGI, would not be affected by equal overstatements of gambling gross income and losses.

## V.   Substantial Understatement Penalty

Section 6662(a) generally imposes a 20-percent penalty, described in the section's title as the "accuracy-related penalty", on underpayments of tax attributable to certain circumstances, including, under section 6662(b)(2), a "substantial understatement of income tax."  Section 6664(a) defines an "underpayment" for relevant purposes not simply as a lack of payment but, in relevant part, as an excess of the correct tax over the sum of (A) the amount shown as tax on the return and (B) amounts not shown as tax on the return but previously assessed or collected.  Since the Orrs paid only a small amount of tax before filing the return and reported on the return that no tax was due, the majority of their correct tax liability for the year was an "underpayment" under section 6664(a).  (This is true regardless of the precise amount of their omitted retirement benefits, which, as we discuss later, remains to be determined.)  Section 6662(d) provides that a substantial understatement of income tax is, with exceptions not relevant here, the excess of the correct tax required to be shown on the return over the tax shown on the return, but only if that excess is greater than the greater of (1) $5,000 and (2) 10 percent of the correct tax.[42]  Since the Orrs'

---

[42]Sec. 6662(d)(2)(B) provides that a portion of an understatement attributable to a position which, although ultimately determined to be erroneous, is or was supported by "substantial authority", or has a "reasonable basis" and was

(continued...)

income tax for 2004 as properly determined without the deduction for net gambling losses exceeds $5,000 (regardless of the precise amount of the omitted retirement benefits), and the tax shown on the return was zero, they have a substantial understatement of income tax for the year. It is undisputed that the entire underpayment is attributable to the substantial understatement.

Section 6664(c) provides that no penalty shall be imposed under section 6662 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.

The Orrs argue that they had reasonable cause for omitting the retirement benefits because Orr had diminished mental capacity on account of her depression. They further argue that if their deduction of net gambling losses was in error (and it was, as we have explained), Orr's diminished mental capacity and unsuccessful attempts to understand the law constitute reasonable cause. As discussed earlier, Orr's husband was too ill to be expected to ensure that the Orrs' joint return was filed correctly. The

---

[42](...continued)
adequately disclosed to the IRS, is not taken into account in determining the existence of a "substantial understatement". Neither party argues that this rule is relevant. We need not consider it because we decide that the Orrs are excepted from any substantial-understatement penalty on the ground that they had reasonable cause for and acted in good faith with respect to each of their errors. See sec. 1.6662-3(b)(3), Income Tax Regs.

record does not indicate that anyone else had a duty to ensure the return was correct: there was no agent or guardian, for example. Thus, we consider the reasonableness of the actions taken to ensure the return was correct only in the light of Orr's own diminished mental capacity.

The IRS argues that Orr's attempts to understand the law were not sufficient, and her mental capacity was not sufficiently diminished to constitute reasonable cause.[43] In support, it argues that she was "able to carry out her gambling trade or business" during 2004 and that one would generally be expected to be familiar with the tax laws relating to one's business. It further argues that Orr's mental state was sufficient that she "could adequately carry on her personal affairs", "take care of her ailing mother and husband", and "keep accurate business records of her gambling enterprise as well as two other business enterprises"; and that Orr's implicit contention that she was a novice in tax law research was undermined by her work for H&R Block and her "familiarity with" TurboTax.

---

[43]The IRS has the burden of production with respect to the penalty, which has been met. See sec. 7491(c). Because we affirmatively find that Orr suffered from diminished mental capacity that constituted reasonable cause for the errors, we express no view on which party had the burden of proof.

The IRS did not contend that Orr acted in bad faith separate from the argument that she did not have reasonable cause.[44] The kinds of activities Orr conducted in connection with filing the return--doing legal research and discussing her situation with the IRS, tax advisers, and colleagues--tend to indicate that she was honestly attempting to file it correctly. Her transactions are consistent with a good-faith mistake: she simply claimed a deduction for an actual business loss, which, were it not for a special rule, normally would be deductible. She described the transactions on her return clearly, as a business of "gambling" in which she incurred "gambling losses", making no attempt to hide the tax issue, and enabling the IRS to easily determine whether an examination would be appropriate. Moreover, Orr's omission of some or all of the Orrs' retirement benefits appears to be essentially an "isolated computational or transcriptional error" that "generally is not inconsistent with reasonable cause and good faith." Sec. 1.6664-4(b)(1), Income Tax Regs. Consequently, we infer that if Orr's mental capacity was sufficiently diminished that she would have honestly understood her objectively flawed

---

[44]The IRS concludes the section of its brief addressing the accuracy-related penalty by stating that "petitioners in bad faith and without reasonable cause tried to circumvent the limitations of § 165(d)" but does not specifically explain why it believes they acted in bad faith. If Orr's mental capacity was not sufficiently diminished for her to have believed that she had done enough to ensure her return was correct, it would follow that she did not act in good faith. But if that were the case, she would not have reasonable cause for her errors, either.

efforts to file a correct return to be adequate (a point we address later), she acted in good faith.

Section 1.6664-4(b)(1), Income Tax Regs., interprets "reasonable cause" for purposes of section 6664 in relevant part as follows:

> The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Generally, the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge and education of the taxpayer. * * *

We have found tax compliance failures resulting from mental illness, including severe emotional disturbance, to be due to reasonable cause and not inconsistent with good faith. In Ruckman v. Commissioner, T.C. Memo. 1998-83, we found reasonable cause for an omission of income from a joint return where the spouse who handled the couple's finances was undergoing extensive treatments for cancer and the other, who had long relied on her to handle their finances, was "undoubted[ly] impact[ed] [by] having a spouse battling a life-threatening illness". She, similarly to Orr, testified that "I didn't know that I wasn't capable of what I was trying to do." In Gray v. Commissioner, T.C. Memo. 1982-392, we found reasonable cause for omissions of income from a joint return (some of which omissions the taxpayers were unable to explain as

other than simply accidental) where one spouse became totally disabled and required hospitalization periodically throughout the year, placing a "significant emotional drain" on the other, who read various publications in the course of taking what she described as "great care" to file the return. See also Kees v. Commissioner, T.C. Memo. 1999-41. (Some of the foregoing cases address former section 6653, Additions to Tax for Negligence and Fraud, a precursor to the current accuracy-related and fraud penalties that was also subject to a reasonable-cause exception.)

We are satisfied that Orr suffered from diminished mental capacity that impaired her ability to file a correct tax return, and that she was not sufficiently aware of this diminution for us to find bad faith from her failure to do something more than she did (such as her failure to hire a tax adviser). Orr gave undisputed testimony that her employer had granted her early retirement for permanent disability on account of her depression. She also stated, and we accept, that the fact of her disability was certified by a doctor. Her mother, for whom she had been caring, had recently died; two of her brothers also had recently died; and her husband had an illness, believed to be terminal, which continued to require her care. Her conduct of her "businesses", discussed later, corroborates that she did not understand how far her mental capacity had diminished. We have in the past accepted evidence less extensive than what Orr presented

to establish diminished mental ability as reasonable cause for penalty purposes. See <u>Ruckman v. Commissioner</u>, <u>supra</u> (in which we excused the couple from a penalty in part on the basis of the "undoubted impact" upon the spouse who prepared the return of having a spouse battling a life-threatening illness); <u>Gray v. Commissioner</u>, <u>supra</u>.

We noted earlier that in her pretrial memorandum Orr asserted that the issue in this case was whether "To allow or disallow gambling losses above the line" and that Orr believed that an IRS publication's statement that a net gambling loss was not deductible did not apply to a professional gambler. Informal IRS guidance is not itself law, but a reasonable misunderstanding of its discussions of law can be relevant to whether a taxpayer should be excused from a penalty.[45] See <u>Gray v. Commissioner</u>, <u>supra</u>. Because Orr did not explain which publication she used or how it contributed to her error and because other evidence suffices to establish reasonable cause, we do not consider her use of the IRS publication.

---

[45]It is well established that an ambiguity or error in informal guidance, such as IRS form instructions and informal publications, "cannot affect the operation of the tax statutes or * * * [a taxpayer's] obligations thereunder." See <u>Weiss v. Commissioner</u>, 129 T.C. 175, 177 (2007). We have also held more broadly that interpretations of tax law in these informal materials are not authoritative. See <u>Green v. Commissioner</u>, 59 T.C. 456, 458 (1972).

The IRS' argument that Orr's handling of her businesses indicates that her mental ability was not so diminished as to prevent her from filing a correct tax return is misplaced. None of Orr's businesses had a reasonable potential for profit. The fact that she thought they did tends to show that her mental capacity was diminished, and the fact that she persisted in them tends to show that she did not know how far her mental capacity had diminished.

We reject the IRS' argument that Orr's ability to keep financial records for her businesses indicates a high degree of sophistication. As discussed earlier, all of these records were very simple. The records indicate Orr's ability to accurately report the amounts of what she understands to be her income and deductions--which, generally, she did. But they do not indicate an ability to adequately address the legal issue of whether a professional gambler may deduct net gambling losses.

We reject the IRS' argument that Orr's care for her ailing mother and husband, or her ability to "carry on her personal affairs" meant that she did not have reasonable cause for the errors on the return. Nothing suggests that Orr's care for her mother and husband reflected a degree of sophistication relevant to tax return preparation rather than simply hard work. Her ability to care for them suggests at most that she may have had the ability to perform periodic tasks, such as filing a tax return

every year, which she did.  As discussed earlier, Orr's handling of her affairs did not reflect any degree of sophistication.  Her employer had found her unable to do her job.  Her "businesses" were illogical.  (The parties did not elaborate on the Orrs' sales of shares, but, as discussed earlier, these appear not to reflect any particular skill or judgment.)  Tamberella v. Commissioner, 139 Fed. Appx. 319, 323 (2d Cir. 2005), affg. T.C. Memo. 2004-47, which the IRS cites for the proposition that carrying on one's personal affairs indicates a lack of reasonable cause, is distinguishable.  In Tamberella, we held and the Court of Appeals for the Second Circuit affirmed that a taxpayer did not have reasonable cause for an omission of income from his return on the ground of mental incapacity.  We found that he had been hospitalized for mental illness on two occasions--10 days near the beginning of the year before the year at issue and 5 weeks a few years after the year at issue--but that there was no evidence that he suffered from any mental incapacity in the interim.  We also found that during the tax year at issue he had represented himself in an arbitration proceeding and settlement negotiations through which he obtained a large employment-related award.  Mental incapacity did not actually prevent that taxpayer from complying with his tax obligations.  He was just trying to use mental incapacity from an irrelevant period as an excuse for not complying.

The fact that Orr once prepared tax returns at H&R Block does suggest that she had more relevant knowledge and experience than the average taxpayer. But we infer that her skills deteriorated with time and with her overall mental capacity. By the time she prepared her 2004 return, she was neither able to determine the correct treatment herself nor recognize that she was unable to do so. We note, moreover, that Orr's way of addressing an issue she found difficult would have been very roughly correct even for a tax expert: she consulted others in her industry, IRS employees, accountants, a lawyer, and a law librarian, and considered these people's advice in the light of her own experience, research, and analysis. Orr should have made a greater effort to find someone able to help her with her particular tax issue, but we find her diminished mental capacity to be reasonable cause for this omission.

We reject the IRS' argument that Orr's "familiarity with TurboTax" "undermines her contention that she is a novice in tax law research." Nothing about Orr's use of TurboTax suggests special knowledge of tax law or tax law research.

We have found before that taxpayers with substantial tax and financial experience can become unable to prepare their returns correctly. In Gray v. Commissioner, T.C. Memo. 1982-392, the spouse who prepared the return had for many years prepared returns reporting the taxpayers' farming activities. In Ruckman v.

Commissioner, T.C. Memo. 1998-83, the spouse who prepared the return had for many years maintained financial records for and consulted with an accountant for the preparation of returns reporting the taxpayers' trucking activities. (While those taxpayers apparently had not prepared tax returns professionally, the limited record before us does not show Orr's experience to be much greater than theirs.) We accepted the distress Gray suffered as a result of her husband's becoming totally disabled and requiring hospitalization from time to time throughout the tax year, and the distress Ruckman suffered as a result of undergoing extensive cancer treatments, as being reasonable cause for their tax compliance problems. We similarly accept as reasonable cause for Orr's significant but apparently isolated compliance problems her diminished mental capacity associated with depression which made her unable to work, her gambling problem, her recent loss of multiple family members, and her responsibility of caring for her ailing husband.

## VI. Computation of Retirement Benefits

The stipulation of facts that the parties submitted jointly at trial stipulated that the Orrs received and reported Railroad Retirement Board and Social Security benefits totaling $30,391 (the stipulated retirement benefits):

> 4. During the 2004 taxable year, the petitioners received retirement benefits of $17,784.00 from the U.S. Railroad Retirement Board and $12,607.00 from the Social Security Administration.

5. The petitioners failed to report any of the retirement benefits on their 2004 federal income tax return.

In the Orrs' reply brief, however, Orr argues that:

I know retirement funds are taxable and I don't know why I did not include them; I thought I had everything listed. I have enclosed a copy of Form 1040 showing I <u>DID</u> report $16,470 of which $9,529 was considered taxable."[46]

The Orrs had reported $16,470 on the return's line entitled "Pensions and annuities", and, of this, $9,529 on the return's next line, entitled "Taxable amount" (of the "Pensions and annuities"). Social Security and certain Railroad Retirement Board benefits should have been entered on a different line, entitled "Social security benefits" (with a corresponding line for "Taxable amount"), on which the Orrs did not enter any amount. 2004 1040 Instructions at 24. It seems possible, however, that the Orrs mistakenly entered their Social Security and Railroad Retirement Board benefits on the line for "Pensions and annuities": these benefits are a kind of pension, in the generic sense, and, like certain other pensions, they are only partially

---

[46]We consider the partial copy of the Orrs' return enclosed with their reply brief merely an informal reference to the copy of the return which the parties had earlier submitted as a joint exhibit and stipulated to be authentic.

Orr should not have waited until filing her reply brief to introduce the retirement-benefits issue. But we consider it because we conduct proceedings in sec. 7463 "small tax cases" informally and because the IRS will have a full opportunity to address the issue in a Rule 155 computational proceeding.

taxable.  See, e.g., secs. 72 (annuities, including certain pensions), 86 (Social Security and Railroad Retirement Board benefits).  Since the record before the Court does not specify the source of the amounts they listed on the relevant lines,[47] we do not know whether the $16,470 of "pensions and annuities" they reported were a part of the $30,391 of stipulated retirement benefits or are a separate amount of income.

If the Orrs reported some of the stipulated retirement benefits on the return, only a part of the stipulated retirement benefits (and only a part of their taxable portion) would properly be added to the figures they had listed for "pensions and annuities" in determining the Orrs' taxable income, and tax, for the year.  Alternately, the Orrs may simply have reported on the return "pensions and annuities" other than the amounts to which the stipulation refers.

We decline to adopt paragraph 5 of the stipulation as a finding of fact.  We may permit a party to contradict a stipulation "where justice requires", and "We are not bound by stipulations of fact that appear contrary to the facts disclosed by the record."  Rule 91(e); Estate of Eddy v. Commissioner, 115 T.C. 135, 137 n.4 (2000); see also Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976).  The record before the Court calls paragraph

---

[47]Any relevant information returns or payee statements that the Orrs may have filed with the return, such as IRS Forms 1099, are not before the Court.

into doubt, and we observe that Orr's diminished mental capacity makes her more likely than a typical litigant to have failed to notice--despite exercising care reasonable in her circumstances-- that she had already reported an amount on her return.  Therefore, we will leave (1) the portion of the Orrs' "pensions and annuities", if any, that is separate from the stipulated retirement benefits and (2) the portion of the stipulated retirement benefits that is taxable for the parties to compute under Rule 155.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.